IN RE INTEREST OF TY M. AND DEVON M.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE, V.
SHAWN M., APPELLANT, AND HOLLY M.,
APPELLEE AND CROSS-APPELLANT.
655 N.W.2d 672

Filed January 17, 2003. No. S-02-056.

Avis R. Andrews for appellant.

Pamela Lynn Hopkins for appellee Holly M.

Don Stenberg, Attorney General, and Stuart B. Mills, Special Prosecutor, for appellee State of Nebraska.

Leta F. Fornoff, guardian ad litem.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Shawn M. and Holly M. each appeal from a judgment of the county court for Dodge County, sitting as a juvenile court, which terminated their parental rights to Ty M., born March 23, 1997, and Devon M., born June 10, 1998.

## SCOPE OF REVIEW

■ In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002).

■ In reviewing questions of law arising under the Nebraska Juvenile Code, an appellate court reaches conclusions independent of the lower court's ruling. *In re Interest of Chad S.*, 263 Neb. 184, 639 N.W.2d 84 (2002).

## FACTS

Ty and Devon were placed in the care, custody, and control of the Nebraska Department of Health and Human Services (DHHS)

on November 20, 1998, after police were sent to the home to investigate a report that the children were in danger based on neglect. At the time, Ty was approximately 1½ years old and Devon was approximately 5 months old.

The children were with a babysitter when police arrived. The living room floor was nearly covered with toys, dirty clothing, food, cigarette butts, and garbage. Bottles found in the home contained spoiled formula or milk, and there were feces stains on the carpet. Holes had been punched through two doors. Soiled dishes were piled high in the kitchen, and no clean dishes were found. The children's room had a strong odor of urine and spoiled formula or milk. The sheets and pillowcases in the children's room had dried vomit and urine on them.

Although the parents had been counseled not to smoke because Devon has reactive airway disease, there was a strong odor of tobacco in the home. An apparatus for giving Devon breathing treatments was filthy and unusable, and there was no medication for the machine in the home.

The children were initially placed with Shawn's parents until December 7, 1998, when they were returned to the parental home. The children were again removed from the home on February 3, 1999, and placed with the grandparents until October 1, when they were placed in foster care.

The children were adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1998) on March 24, 1999, in relation to Holly, at which time she admitted the allegations in the petition. Following a hearing on April 14, the children were adjudicated in relation to Shawn.

Between April 20, 1999, and January 16, 2001, six case plans were received and reviewed by the juvenile court. The case plans spelled out a number of goals for both parents, including marital counseling, mental health counseling, anger management skills, domestic violence counseling, parenting skills, and finances.

A petition to terminate parental rights was filed on February 27, 2001. The petition alleged that grounds for termination existed under Neb. Rev. Stat. § 43-292(6) (Reissue 1998) because (1) the children had been determined to be children under § 43-247(3)(a) and (2) following that determination, reasonable efforts had been made to preserve and reunify the

family, and the efforts had failed to correct the conditions which led to that determination. The petition also alleged that grounds for termination existed under § 43-292(7) and that termination would be in the best interests of the children, who had been in out-of-home placement for 15 or more of the most recent 22 months.

An amended petition to terminate parental rights alleged that the parents failed to maintain adequate housing for themselves and their children from February 1999 to October 2000; the parents failed to demonstrate proper and consistent parenting skills during supervised visitations despite family support services, parenting classes, and supervised visitation; the parents failed to follow through with recommendations of mental health providers; and the parents failed to maintain a stable relationship.

On January 8, 2002, the juvenile court entered an order terminating parental rights. The court found that the adjudication under § 43-247(3)(a) "acknowledges that there are collective conditions which lead to a very filthy health hazard environment making conditions unsafe and unsanitary." The court further found that the State had maintained ongoing, continuing, and reasonable efforts to sustain and keep the family together, including ongoing visitation plans.

The juvenile court found an ongoing level of deterioration within the home, including lack of parenting skills, lack of awareness and sensitivity to the children and their needs, and marital strife and conflict. Holly had reported violence and a feeling of fear to her DHHS caseworker and other professionals. She stated that she was unable to meet the needs of her children and that she feared for her children's safety with Shawn. The court found that Holly's admissions of domestic violence to DHHS professionals were consistent with the evidence and that Holly had on many occasions indicated her intent to divorce Shawn.

The juvenile court noted that Shawn was in jail from October 1999 through October 2000, after which he reunited with Holly. At the time of the court order, they were living in a home provided by Shawn's parents. During Shawn's incarceration, he did not follow through with required levels of counseling and parenting classes. He sporadically participated in a men's group after his

release, but the court found that neither parent maintained involvement in individual counseling or fully utilized the available opportunities, despite the family support workers' efforts and DHHS resources.

During ongoing visitations, both parents demonstrated an inability to control the children. The juvenile court found that neither parent consistently recognized safety issues regarding the children. Holly failed to timely follow through with her psychological evaluations and to take her medication for depression.

The juvenile court concluded that the rehabilitation plans ordered by the court were designed to correct the unsafe conditions in the home and that these unsafe and unsanitary conditions reflected problems with parenting skills, with domestic violence, and with recognizing the needs of the children. The court found that the parents consistently failed to comply with reasonable steps for rehabilitation as ordered by the court by failing to attend individual counseling, address spousal violence, or demonstrate proper parenting skills during visitations. The evidence showed that DHHS provided multiple resources and services for both Shawn and Holly, but neither showed an ability or consistent commitment and willingness to succeed. The parents had been unable to make satisfactory progress toward reunification.

The juvenile court found that the evidence supported termination of parental rights under § 43-292(6) in that the parents had been provided many reasonable opportunities to rehabilitate and had failed to do so. Shawn and Holly willfully failed to comply in whole or in part with the material provisions of the rehabilitation plans, including failure to demonstrate proper parenting skills and failure to keep the children reasonably safe during visitations. The parents also demonstrated lack of followthrough with individual therapy and did not address domestic violence issues. The children had been in out-of-home placement for 15 or more of the most recent 22 months, specifically since February 3, 1999. The court found clear and convincing evidence that it is in the best interests of the children to terminate the parental rights. The court ordered custody of the children to remain with DHHS for appropriate placement with the objective of adoption.

## ASSIGNMENTS OF ERROR

Shawn and Holly have each assigned numerous errors covering a variety of issues. However, because a number of the assigned errors are not argued in the parties' briefs, we will not address them. See *Caruso v. Parkos*, 262 Neb. 961, 637 N.W.2d 351 (2002). We will address only the alleged errors as summarized and restated here: (1) The juvenile court erred in "failing to enforce" the parties' due process rights and constitutional rights, (2) the court erred in finding that it is in the best interests of the children that the parents' rights be terminated, (3) the court erred in overruling Holly's motion to strike, (4) the court erred in overruling the motions for psychological and psychiatric evaluations of the children, (5) the court erred in admitting certified court documents, (6) the court erred in finding that reasonable efforts had been made to preserve and reunify the family, and (7) the court erred in failing to find § 43-292(7) unconstitutional.

## ANALYSIS

In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). In reviewing questions of law arising under the Nebraska Juvenile Code, an appellate court reaches conclusions independent of the lower court's ruling. *In re Interest of Chad S.*, 263 Neb. 184, 639 N.W.2d 84 (2002). We find no merit to any of the assigned errors and hold that the juvenile court's order should be affirmed.

### Due Process Rights

Both parents claim that their due process rights were violated at some point during the termination proceedings. In summary, Shawn claims that he was denied due process in that for 2 years following the adjudication, he had no procedural notice that the children were in custody for any other reason than the fact that the house was unsafe and unsanitary. The parties stipulated that the cleanliness of the home was no longer an issue after September

2000, and based upon the stipulation, Shawn claims that the condition of the house was not an issue for 1 full year prior to the hearing on termination. He claims that the termination proceeding exceeded the juvenile petition by adding that the parents had failed to maintain adequate housing for themselves, failed to demonstrate proper and consistent parenting skills during supervised visitation, failed to follow through with recommendations of mental health providers, and failed to maintain a stable relationship. He asserts there was no evidence to show that the parents were ever advised prior to the filing of the petition for termination of parental rights that their parental rights could in fact be terminated. He also claims that there was no adequate advisement of rights made by the juvenile court prior to the adjudication, as required by Neb. Rev. Stat. § 43-279.01 (Reissue 1998). In addition, he claims that his due process rights were violated because the court failed to properly advise the parents of their rights and possible consequences of the State's petition during the adjudication process. Finally, Shawn argues that his due process rights were violated when he was not given the opportunity to challenge the evidence, which included extensive hearsay and evidence which lacked foundation.

In summary, Holly asserts that since the adjudication was made on the basis that the house was dirty, evidence regarding termination as to any factor other than the improvement or lack of improvement in the cleanliness of the house was irrelevant for purposes of termination of parental rights. Holly claims that the parents repeatedly attempted to exercise their rights through motions to strike, motions in limine, and motions to bifurcate, and through relevancy and material objections, which were all overruled.

Holly further claims that the juvenile court failed to obtain original jurisdiction under the adjudication and that, therefore, the court had no jurisdiction to enter subsequent case plans or to proceed to a termination based on § 43-292(6) or (7). She asserts that the parents were not advised of their rights at the adjudication as required by § 43-279.01. She also argues that the adjudication was based on the condition of the house and that any case plans which addressed other issues are irrelevant and therefore cannot supply a basis for termination proceedings.

158

■ In *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 459, 598 N.W.2d 729, 737 (1999), we addressed the due process rights of parents in termination proceedings and the importance of those rights: "[S]tate intervention to terminate the parent-child relationship must be accomplished by procedures meeting the requisites of the Due Process Clause." We have also stated:

> Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker.

*In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 476-77, 590 N.W.2d 392, 401 (1999).

The initial termination petition, filed on February 27, 2001, alleged that the children were juveniles as defined in § 43-247(3)(a), which gives the juvenile court jurisdiction over, inter alia, any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." The petition was amended on May 31 to state that the children had been in out-of-home placement since February 3, 1999, that the parents failed to maintain adequate housing for themselves and the children from February 1999 to October 2000, that the parents failed to demonstrate consistent parenting skills, that the parents failed to follow through with recommendations of mental health providers, and that the parents failed to maintain a stable relationship.

The bill of exceptions from the adjudication hearing on March 24, 1999, shows that Holly was present with counsel and that Shawn appeared pro se. The State informed the juvenile court that an amended petition had been filed and asked the court if it wanted to "re-arraign" the parents on the amended petition. The court stated: "It wouldn't hurt to go ahead and do that since we will have to set this matter down for trial." The court then asked Holly's counsel if he wished to have the amended petition formally read, and the court asked Shawn if he had heard the additional sentence which was included in the

amended petition. Shawn responded: "I've looked it over, your Honor, but I'm not exactly sure. I'd have to look at the papers again." The court noted that one sentence had been added and then stated: "Everything else in the juvenile petition that was previously read to you is the same. That's the only — only additional piece." Shawn stated: "So, with this we would still be charged with — [.]" The court stated: "Everything is exactly the same. The State is just alleging specific issues, so that you are aware of." At that point, Holly's counsel stated that she understood the allegations, and she admitted the allegations.

The juvenile court informed Holly that it had jurisdiction and could require her to take necessary steps to meet the needs of the children, and she indicated that she understood. The court told her that if it accepted her admission and if the children were outside the parental home for more than 15 months of the next 22 months, the State could file a petition for the termination of her parental rights, and she indicated her understanding. Holly stated that no threats or promises had been made to her and that she was not under the influence of chemicals or drugs that would affect her thinking. The State offered a factual basis, stating that on November 18, 1998, police were dispatched to the parents' home, which was found to be in an unsafe and unsanitary condition that was dangerous to the welfare of the children. The children were taken into protective custody, and a juvenile petition was filed. Holly agreed that the statements were accurate as applied to her.

The juvenile court found that Holly had admitted the allegations, there was a factual basis for her admission, and the admission was voluntary, knowing, and intelligent. The court accepted the admission and found, as to Holly, that the children should be adjudicated as juveniles under § 43-247(3)(a).

Shawn was present during the above-described discussions. The juvenile court stated that Shawn had "exercised [his] rights" and that on April 14, 1999, the State would present evidence and Shawn could ask questions of the witnesses and present evidence of his own. Shawn requested a copy of the current charges, and the court asked if he had a copy of the amended petition. Shawn said he had a copy, and then asked: "Does that take care of the last one — of the allegations of child abuse?

That's what I didn't understand." The court explained that the single sentence that was read to Shawn from the amended petition was the only change. The court stated: "The last petition you received, you read and you understood. The amended petition, the only additional change to that is that sentence that I read to you, and you have a copy of this petition, which reflects that additional sentence." Shawn indicated that he understood.

At the April 14, 1999, hearing on the allegations as to Shawn, the juvenile court noted that Shawn had waived his right to an attorney and was representing himself. The court informed Shawn that it was the State's burden to present evidence and that he had the right to cross-examine witnesses and to present evidence.

As to Shawn, the juvenile court found that the State had met its burden of proof by a preponderance of the evidence that the juveniles were as described within § 43-247(3)(a) and again ordered custody to remain with DHHS.

We do not have a verbatim transcript of the hearing held on December 16, 1998, which was prior to the adjudication. However, the record presented to this court indicates that Shawn waived his rights and that Shawn and Holly were both represented by counsel at that hearing. The court order indicates that the court inquired as to their understanding of the contents of the petition, their rights, and the possible consequences if the allegations were admitted. This order was received as an exhibit without objection during a hearing on Shawn's motion to dismiss. Later in the hearing, the parties' objection to the exhibit was overruled.

It is the responsibility of the party appealing to provide a record which supports the claimed errors. See *In re Estate of Krumwiede*, 264 Neb. 378, 647 N.W.2d 625 (2002). The parents have failed to provide a record which supports their assertion that they were not properly advised prior to the adjudication of their rights and the possible consequences of termination of their parental rights.

The record does not indicate that any appeal was taken from the adjudication under § 43-247(3)(a). A proceeding before a juvenile court is a "special proceeding" for appellate purposes. *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651

N.W.2d 231 (2002). A judicial determination made following an adjudication in a special proceeding which affects the substantial right of parents to raise their children is a final, appealable order. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

■ More specifically, it has been held that a dispositional order imposing a rehabilitation plan for parents in a juvenile case is a final, appealable order. *In re Interest of Tabatha R.*, 255 Neb. 818, 587 N.W.2d 109 (1998). See, also, *In re Interest of Clifford M. et al.*, 6 Neb. App. 754, 577 N.W.2d 547 (1998). In *In re Interest of Joshua M. et al.*, the rehabilitation plan challenged by the mother had been adopted by the juvenile court directly following the court's adjudication of the children as within § 43-247(3)(a). The mother agreed to the plan and did not appeal from the dispositional order. On appeal, we did not permit her to collaterally attack the plan adopted in the dispositional order. "Collateral attacks on previous proceedings are impermissible unless the attack is grounded upon the court's lack of jurisdiction over the parties or subject matter." *In re Interest of Joshua M. et al.*, 251 Neb. at 629, 558 N.W.2d at 559, citing *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993).

■ The record shows that there were a number of dispositional hearings held and case plans entered during the 2 years following the adjudications of March 24 and April 14, 1999. We conclude that the parents are not permitted to collaterally attack the adjudication or the case plans that were adopted pursuant to the adjudication. In the absence of a direct appeal from an adjudication order, a parent may not question the existence of facts upon which the juvenile court asserted jurisdiction. *In re Interest of Phyllisa B., ante* p. 53, 654 N.W.2d 738 (2002); *In re Interest of Brook P. et al.*, 10 Neb. App. 577, 634 N.W.2d 290 (2001). We find that the parents have not demonstrated they were denied due process with regard to the adjudication.

At the termination hearing on May 2, 2001, Shawn and Holly each waived the reading of the petition. The juvenile court informed the parents of the following rights: (1) the right to be represented by an attorney; (2) the right to remain silent, and if that right was waived, anything the parties said could be

used against them; (3) the right to admit or deny the allegations, and if denied, the State must prove the allegations by clear and convincing evidence; (4) the right to confront and cross-examine witnesses; (5) the right to call witnesses on their own behalf; (6) the right to a speedy adjudication; and (7) the right to appeal any final decision.

Attached to the petition to terminate parental rights is a summons which is addressed to Shawn, Holly, Ty, and Devon, and a notice entitled "Some Important Rights." The rights identified include the right to an attorney or court-appointed counsel; the right to remain silent; the right to admit or deny the allegations, and if the allegations are denied, that the State must prove them as provided by law; the right to confront and cross-examine witnesses; the right to summon witnesses; the right to a speedy adjudication; and the right to appeal any final decision.

At a hearing on September 9, 2001, the State noted that the parents had not entered a denial of the allegations, and the amended petition was then read. The juvenile court asked the parents if they understood. Shawn objected, asserting that the arraignment should have taken place at the adjudication. Shawn then stated that he understood the rights as read to him. Shawn's counsel argued that his motion to dismiss was based on the failure to arraign at the adjudication and that the State's action was too late. Counsel asked that Shawn's response be stricken as not made on advice of counsel. The court noted the objections and found that the parents were present when the amended petition was read, that they understood the English language, and that both had preserved their objections.

The juvenile court also found that the parents had been informed of their right to counsel and that each was represented by counsel, their right to remain silent, their right to confront and cross-examine witnesses, their right to testify and compel witnesses to attend and testify, their right to a speedy adjudication, and the right to appeal. Each responded that they understood the rights. The court then entered a denial of the allegations by both parents and explained that the standard of proof is clear and convincing evidence. We find that the assignments of error regarding an alleged denial of due process are without merit.

BEST INTERESTS OF CHILDREN

Holly argues that the juvenile court erred in finding that it is in the best interests of the children to terminate her parental rights. She asserts that none of the witnesses could identify anything other than minor negative events which occurred while the children were in the parents' care and that the children have sustained significant harm while in the care of the foster parents.

■ In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists *and* that termination is in the children's best interests. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). The purpose of § 43-292(6) is to advance the best interests of the children by giving the juvenile court power to terminate parental rights where the grounds for adjudicating the children within § 43-247(3)(a) have not been corrected. *In re Interest of Rachael M. & Sherry M.*, 258 Neb. 250, 603 N.W.2d 10 (1999).

The State alleged as one ground for termination of parental rights that following a determination that the juveniles are ones as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the § 43-247(3)(a) determination. See § 43-292(6).

The parents argue that because it was stipulated that the condition of their home was not an issue after October 2000, the State has not proved by clear and convincing evidence that reasonable efforts failed to correct the unsafe and unsanitary home which was the basis for the initial adjudication. Holly contends that even if the State can assert the failure to follow the specific details of the case plan as a basis to terminate parental rights, the details of the case plan must be material to addressing the § 43-247(3)(a) adjudication.

■ Where the failure of a parent to comply with a rehabilitation plan is an independent ground for termination of parental rights, the rehabilitation plan must be conducted under the direction of the juvenile court and must be reasonably related to the objective of reuniting parent with child. *In re Interest of Joshua M.*, 251 Neb. 614, 558 N.W.2d 548 (1997); *In re Interest of C.D.C.*, 235 Neb. 496, 455 N.W.2d 801 (1990). Once a plan of reunification has been ordered to correct the

conditions underlying the adjudication under § 43-247(3)(a), the plan must be reasonably related to the objective of reuniting the parents with the children. See *In re Interest of C.D.C., supra.*

We have found that there was a proper adjudication and that the juvenile court acquired jurisdiction of the parties. The parents cannot now collaterally attack the proceedings or the contents of the case plans that were implemented for the purpose of reuniting the parents with the children.

The children were initially removed from the home based upon the uncleanliness of the home. The home was filthy, and the conditions were inappropriate for children. Bottles contained spoiled formula or milk. Feces stains were seen on the carpet. The children's room had a strong odor of urine and spoiled formula or milk. The breathing treatment apparatus used by Devon was filthy and unusable, and no medication for the machine was found in the home.

The case plans that were implemented were not adopted merely to teach the parents how to clean a house. If cleanliness was the sole issue to be addressed prior to reuniting the family, it would not have been necessary for DHHS to expend more than $111,000 in resources trying to reunite the parents with the children. The conditions observed in the house were only a symptom of the problems which led to the adjudication and the subsequent plans for reunification. They did not represent a situation which could be remedied by simply hiring a cleaning service.

In its termination order, the juvenile court stated:

> The rehabilitation plan(s) fashioned, determined and ordered by the court . . . were designed to correct the conditions of the home previously adjudicated by the court. These unsafe and unsanitary home conditions reflect problems in parenting skills, domestic violence and recognizing the needs of their children. Examining the reasonable steps for rehabilitation directed by [the] Court ordered plans, the parents consistently fail[ed] to comply by not attending individual counseling, addressing spousal violence or demonstrating proper parenting skills during visitations. . . . The evidence shows that DHHS provided multiple resources and services for both the mother and the father but neither parent shows an ability or consistent commitment and willingness

to succeed. Partial compliance with these plans is not enough. See [*In re Interest of L.H. et al.,*] 241 Neb. 232[, 487 N.W.2d 279 (1992)]. The parents have been unable to make satisfactory progress for reunification.

DHHS began working with Shawn and Holly immediately after the children were adjudicated. The children were first removed from the home and placed with Shawn's parents until December 7, 1998. The children returned to the parental home from December 7, 1998, to February 3, 1999. Between February 3 and October 1, 1999, they again lived with the grandparents. From October 1, 1999, to October 31, 2001, the children resided with foster parents. A number of issues other than cleanliness were identified as areas which Shawn and Holly needed to address.

The juvenile court agreed to a modified case plan received on April 21, 1999, which included goals for each parent. Holly was directed to attend domestic violence sessions and to learn appropriate money management. Shawn was directed to complete anger management classes. Both were directed to undergo psychological evaluation and comply with all recommendations, to refrain from the use of any form of physical discipline, to maintain adequate housing, to obtain and maintain employment, to attend marriage counseling, and to attend and complete parenting classes. The plan specified that there was to be no violence in the parents' home.

A "Court Report/Case Plan" was filed on August 3, 1999. The report indicates that the parents had demonstrated an ability to bring the home to a "minimal standard level" of cleanliness, but they were unable to maintain it. Holly had moved back in with Shawn after living at a crisis center for a period of time. She had not attended counseling sessions since she moved back in with Shawn, and she did not attend a followup visit with a psychologist. The parents continued to demonstrate inconsistency in interactions with and discipline of the children and needed to be prompted to change diapers, to clean the table after eating, and to exhibit other basic parenting skills. Neither parent demonstrated interest in learning financial management, reporting that they had insufficient money to purchase Holly's medication for depression, but they were able to support their smoking habits.

Shawn reported spending $800 to repair a car. The DHHS workers recommended that the parents continue marriage counseling and individual counseling, obtain skills needed to protect the children, maintain a clean and safe environment for the children, and attend family therapy. It was recommended that Shawn continue anger management classes and that Holly continue domestic violence sessions.

Additional case plans were filed and received by the juvenile court on April 20 and October 20, 1999, April 21 and August 31, 2000, and January 12, 2001. At a hearing on November 30, 2001, Mary Goodwin, a protection and safety worker for DHHS who had been the caseworker for the parents since April 2000, testified as to the goals outlined in the final case plan for reunification of the family.

The first goal was for Holly to acquire skills to provide a clean and safe environment for the children. While Shawn was incarcerated between October 1999 and October 2000, Holly lived in various places, but did not have a residence of her own. In September 2000, Holly had obtained her own residence, but she said she was not ready to have the children returned to her. Holly had requested that the children be removed from the home in February 1999 because she was afraid of Shawn, who had broken a car window and "thrown the other son, Nicki, around."

A second goal was for Holly to address her mental health issues and comply with all mental health recommendations. Holly dropped out of therapy between August and November 2000 and again in May 2001.

The third goal called for Holly to acquire the skills needed to protect her children from domestic violence by participating in a domestic violence support group and to demonstrate an ability to assert herself in a way that would protect her and the children. Holly attended three sessions on domestic violence in November and December 2000. She received a psychiatric evaluation on July 31, 2000, and was given medication for depression. Psychological evaluations were later scheduled, but neither Holly nor Shawn appeared, and they did not reschedule the appointments.

The fourth goal was for Holly to demonstrate the ability to manage her children's behavior at all times during visits.

Goodwin said the children's behavior was chaotic during visits, and Holly admitted that she could not control the children, who would be aggressive toward each other and would not listen to Holly. At times, she would "zone out" and would not notice that the children were "tearing up" the visitation room. On one occasion, they pulled down the drapes. They jumped off tables and climbed up on a file cabinet and jumped off. On another occasion, one boy jumped onto a pile of blankets, injuring another boy who was underneath the blankets. Goodwin stated that these problems were ongoing.

The fifth goal was for Holly to address her marital situation and determine whether it is in the best interests of her children to continue her relationship with Shawn. In September 2000, Holly reported that Shawn had threatened to break her hips, and in October 2000, she reported that she was hiding from Shawn because he was getting out of jail and she was afraid of him. However, the couple reunited when Shawn was released from jail.

The sixth goal was for Holly to learn to manage her finances to demonstrate that she can provide for the basic needs of her children and herself. Holly obtained her own home in September 2000.

The seventh goal was for Shawn to acquire the skills needed to provide a clean environment for his children. Goodwin said he was not able to work on the goal because he was incarcerated for a year.

The eighth goal was for Shawn to address mental health issues and to comply with mental health recommendations. Shawn completed a psychological evaluation in July 1999, which resulted in a finding that Shawn had an issue with anger management. It was recommended that Shawn receive counseling for anger management, parenting issues, and marital issues. After the parents missed appointments for counseling, they were referred to Susan Rippke, an in-home therapist. Shawn had several sessions with Rippke before Shawn was incarcerated. Holly missed approximately five appointments between August and November 1999. She was then scheduled to travel to Omaha for counseling, but dropped out after one appointment. Shawn received some therapy while in jail and was in therapy at the time of the November 2001 hearing.

The ninth goal was for Shawn to gain control over his temper and learn to manage his anger in appropriate ways. When he was released from jail in October 2000, he was referred to a men's group to address domestic violence, but he did not take part.

The 10th goal was for Shawn to increase his parenting knowledge and skills, demonstrate an understanding of child development, learn and utilize nonphysical ways to discipline, and respond to his children in a nurturing manner. Goodwin said the parents had taken advantage of parenting assistance on only a few occasions. Problems with managing the children's behavior during visits continued, and Goodwin reported occasions when Shawn yelled at Ty. Shawn countermanded consequences given by Holly and told the children they did not have to follow her directions. The parents continued to neglect safety issues by allowing the children to ride on the bottom of carts at stores, which resulted in injury to one of the children. The parents allowed Ty to ride a toy motorcycle into the street when a car was approaching.

Goodwin said two family support workers had been present at visitations since June 2001 because Holly had become agitated and upset and threatened to kill Goodwin. Goodwin said the visits had been less chaotic since the second family support worker was introduced. However, the parents continued to have arguments and disagreements during visitations.

The 11th goal was for Shawn to learn to manage his finances to demonstrate an ability to provide for his and the children's needs. Shawn worked at one job from December 2000 to June 2001. At the end of June, he began working at another job, where he reported earning about $1,500 every 2 weeks and working "a lot" of overtime. Holly worked part-time jobs between February 1999 and June 2000, when she began working a full-time job, where she worked until September. She was unemployed between September and November 2000. She worked at another job from November 2000 until September 2001, was unemployed for a while, and then began working again.

Goodwin's testimony indicates that the parents have continued to behave in ways which are not in the best interests of the children. They have received various forms of assistance from

DHHS staff, yet they have not been able to meet the goals set for them over a 2-year period.

While it appears that the parents have addressed some of the issues in the case plans, we have held that

> " 'participation in certain elements of the court-ordered plan does not necessarily prevent the court from entering an order of termination where the parent has made no progress toward rehabilitation. A parent is required not only to follow the plan of the court to rehabilitate herself but also to make reasonable efforts on her own to bring about rehabilitation.' "

*In re Interest of L.H. et al.*, 241 Neb. 232, 246, 487 N.W.2d 279, 289 (1992), quoting *In re Interest of M.*, 235 Neb. 61, 453 N.W.2d 589 (1990). This court has also held that partial compliance with one provision of a rehabilitation plan does not prevent termination of parental rights.

> ▮ In addition, this court has held that the juvenile court is not limited to reviewing the efforts of the parent under the plan last ordered by the court; rather, the court looks at the entire reunification program and the parent's compliance with the various plans involved in the program, as well as any effort not contained within the program which would bring the parent closer to reunification.

*In re Interest of L.J., M.J., and K.J.*, 238 Neb. 712, 719, 472 N.W.2d 205, 211 (1991). A court is not prohibited from considering prior events when determining whether to terminate parental rights, but the court may need to consider the reasonableness of a plan or its individual provisions. See *In re Interest of P.D.*, 231 Neb. 608, 437 N.W.2d 156 (1989). "It is impossible to determine whether a plan to reunite a parent and child is reasonable without considering whether the plan is designed to correct problems which required the State's intervention in the first place. Review of prior events is essential to this determination." *Id.* at 617, 437 N.W.2d at 163.

In our de novo review, we conclude that the record shows by clear and convincing evidence that it is in the best interests of the children to terminate the parental rights of Shawn and Holly. The parents have been provided many reasonable opportunities to rehabilitate, and they have failed to do so. The condition of

the home was merely a manifestation of the parents' inability to properly care for their children. The evidence clearly and convincingly shows that the parents willfully failed to comply in whole or in part with the material provisions of the rehabilitation plans.

### HOLLY'S MOTION TO STRIKE

Holly complains about the juvenile court's overruling of her motion to strike certain allegations of the amended petition. She argues that these allegations were not relevant, were vague and indefinite, and were not related to any material provision of the case plan.

In her brief, Holly argues only that the motion to strike attempted to address issues of due process. Holly has provided no authority for her allegation that the juvenile court erred in failing to grant her motion to strike. For the same reasons noted above related to due process rights, we do not find any merit to this assignment of error.

### PARENTS' MOTIONS FOR PSYCHOLOGICAL AND PSYCHIATRIC EVALUATIONS

Both parents assert that the juvenile court erred in failing to order psychological and psychiatric evaluations of the children. Shawn suggests that the State objected to evaluation of the children because it might impinge on adoption proceedings which were already underway. Shawn apparently wanted the evaluations to demonstrate that the children were having emotional difficulties in the foster home. However, he provides no authority for his argument.

Holly suggests that the evaluations would have been appropriate pursuant to Neb. Rev. Stat. § 43-258 (Reissue 1998), which provides for *preadjudication* mental and physical examinations to aid the court in determining the juvenile's physical or mental condition, the juvenile's competence, the juvenile's responsibility for his or her acts, or the need for emergency medical treatment. At the time the parties requested the evaluations, the children had already been adjudicated as juveniles under § 43-247(3)(a). Section 43-258 is not relevant in this case.

The only reason to conduct psychological or psychiatric examinations would have been to determine whether the children

needed some form of psychological help. Such testing would not have been useful in determining whether the children should be returned to Shawn and Holly. The parents sought the evaluations to show that the children also had emotional problems while in foster care. Even if such a showing had been made, it would not necessarily require that the children be returned to the parental home. We find no authority requiring such evaluations and find no error on the part of the juvenile court for overruling the motions.

### ADMISSION OF CERTIFIED COURT DOCUMENTS

Shawn assigns as error, as a part of his due process argument, that the juvenile court erred in receiving into evidence certified court documents from the underlying juvenile action without foundation and without a transcript of the proceedings. Holly also raises the issue as error and asserts that exhibits 3 through 44 were not based on adjudicated facts and that, as such, the court should not have taken judicial notice of the exhibits. She argues that many of the exhibits are dispositional orders, which are entered following dispositional hearings, at which the rules of evidence do not apply. In addition, she argues that the hearings are conducted based on a preponderance of the evidence standard, which is a lower standard of proof than that used in termination hearings.

As noted earlier, neither Holly nor Shawn appealed from the dispositional orders which found their children to be juveniles under § 43-247(3)(a). This court has held that a detention order issued under § 43-247(3)(a) and Neb. Rev. Stat. § 43-254 (Reissue 1998) after a hearing which continues to withhold the custody of a juvenile from the parent pending an adjudication hearing to determine whether the juvenile is neglected is a final order and thus appealable. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). Shawn and Holly waived this error by failing to appeal from the previous orders.

Holly's argument is also based on an assertion that the juvenile court could not take judicial notice of its earlier orders. We have held that the "concept of judicial notice of *disputed* allegations has no place in hearings to terminate parental rights." (Emphasis supplied.) *In re Interest of L.H. et al.*, 241 Neb. 232, 243, 487 N.W.2d 279, 287 (1992). However, Holly did not dispute the

allegations in the underlying action. In fact, at the hearing on March 24, 1999, she admitted the allegations.

 In addition, we have held that reports may not be received in evidence for the purpose of a termination proceeding, nor relied upon by the court, unless they have been admitted without objection or brought within the provisions of Neb. Evid. R. 803(23), Neb. Rev. Stat. § 27-803(23) (Cum. Supp. 2002), an exception to the hearsay rule. See *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 414 N.W.2d 266 (1987). While the parties objected to the admission of exhibits related to the underlying disposition, they did not object on the basis of judicial notice. The juvenile court was not asked to take judicial notice of the previous orders, but was asked to admit them into evidence. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *Claypool v. Hibberd*, 261 Neb. 818, 626 N.W.2d 539 (2001). Absent a showing to the contrary, it is presumed that the trial court disregarded all incompetent and irrelevant evidence. *In re Interest of L.H. et al., supra.*

 Even if the exhibits were not properly received, the improper admission of evidence by the juvenile court in a parental rights termination proceeding does not, in and of itself, constitute reversible error; a showing of prejudice must be made. *Id.* The parties must show that the inclusion of the exhibits in the evidence was prejudicial to their due process rights. *Id.* Factual questions concerning a judgment or order terminating parental rights are tried by an appellate court de novo on the record, and impermissible or improper evidence is not considered by the appellate court. *Id.* In an appeal from a judgment or order terminating parental rights, the appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. *In re Interest of L.H. et al., supra.*

> "[A]s a subject for judicial notice, existence of court records and certain judicial action reflected in a court's record are, in accordance with Neb. Evid. R. 201(2)(b), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

... [I]n *State v. Norwood*, 203 Neb. 201, 204-05, 277 N.W.2d 709, 711 (1979)[, the court stated]: "[A juvenile court] has a right to examine its own records and take judicial notice of its own proceedings and judgment in an interwoven and dependent controversy where the same matters have already been considered and determined."
*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 708-09, 484 N.W.2d 68, 73 (1992).

In the case at bar, the juvenile court admitted into evidence its own records and case plans in an interwoven and dependent controversy. The assignment of error concerning the admission of court orders has no merit.

### REASONABLE EFFORTS

Shawn argues that the juvenile court erred in finding that reasonable efforts had been made to preserve and reunify the family in the juvenile action and in the termination proceedings. He asserts that the State did not meet its burden because it relied on certified copies of prior court orders and did not elicit testimony on the reasonable efforts which had been made. Shawn appealed from the juvenile court's overruling of his motion to show reasonable efforts, but the appeal was dismissed for lack of a final order. See *In re Interest of Nicholas H. et al.*, 10 Neb. App. xlvi (No. A-01-756, Aug. 30, 2001).

Holly argues that the State did not meet its burden to show that reasonable efforts would not result in reunification of the family. She suggests that the parents' opportunity to work toward reunification was thwarted by the actions of DHHS to decrease visitation.

We have held that the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. "Thus, only one ground for termination need be proved in order [to terminate] parental rights . . . ." *In re Interest of Michael B. et al.*, 258 Neb. 545, 557, 604 N.W.2d 405, 413 (2000).

Section 43-292 identifies the grounds for termination of parental rights. It provides that termination may be ordered when it is in the best interests of the children and another condition exists. Subsection (6) allows for termination after a determination

that the juveniles fall under § 43-247(3)(a) and reasonable efforts to preserve and reunify the family if required under Neb. Rev. Stat. § 43-283.01 (Reissue 1998), under the direction of the court, have failed to correct the conditions leading to the determination. Subsection (7) allows for termination after the juveniles have been in an out-of-home placement for 15 or more months of the most recent 22 months.

The parties stipulated to the dates of the children's out-of-home placement, which clearly showed that they had been out of the parental home for all but 2 of the approximately 36 months before the termination hearing. They were in foster care with nonrelatives for more than 24 months immediately preceding the hearing. Thus, § 43-292(7) applies to these children, and if it is in their best interests to be removed from the home on this basis, the juvenile court may so order.

The record shows that DHHS worked with the family for almost 3 years before parental rights were terminated. The case plans in evidence and the court hearings and orders in the record support a finding that reasonable efforts were made to reunify the family. As we have held on numerous occasions, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). The assignment of error concerning reasonable efforts has no merit.

### UNCONSTITUTIONALITY OF § 43-292(7)

The parents assert that § 43-292(7) is unconstitutional because it uses an arbitrary and vague standard to terminate parental rights based solely on the length of time a child has been placed outside the home. The parents' arguments concerning the constitutionality of § 43-292(7) are stated in broad terms and suggest only that the statute violates due process because it provides an arbitrary standard.

We have frequently held that where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the children require termination of the parental rights. See *In re Interest of DeWayne G. & Devon G., supra.* As the State notes, subsection (7) merely provides a

guideline for the "reasonable time" given to the parents to rehabilitate themselves.

The language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish the existence of one or more of the circumstances described in subsections (1) to (10) of § 43-292. Second, if a circumstance designated in subsections (1) to (10) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. . . . Each of the requirements prescribed by § 43-292 must be proved by clear and convincing evidence.

*In re Interest of Sunshine A. et al.*, 258 Neb. 148, 153, 602 N.W.2d 452, 457 (1999).

Section 43-292(7) is not unconstitutional. Adequate safeguards are provided to ensure that parental rights are not terminated based solely upon the length of time children are in an out-of-home placement.

## CONCLUSION

The children in this case were initially removed from the home because it was filthy and unlivable. Although these conditions were apparently corrected at a later date, they were not the only basis upon which parental rights were terminated. The uncleanliness of the home was a manifestation of a lack of parenting skills on the part of Shawn and Holly. During a period of more than 2 years, the parents were unable to correct these deficiencies.

We find no error on the part of the juvenile court in its judgment terminating the parental rights of Shawn and Holly to Ty and Devon. The judgment is affirmed.

AFFIRMED.