IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF HUNTER L. & OPIE L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HUNTER L. & OPIE L., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AMBER L., APPELLANT.

Filed January 9, 2018.    Nos. A-17-652, A-17-653.

Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Leonard G. Tabor for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Amber L. appeals from the decision of the county court for Scotts Bluff County, sitting as a juvenile court, terminating her parental rights to her minor children, Hunter L. and Opie L. After our de novo review of the record, we affirm.

## BACKGROUND

Amber is the mother of Hunter and Opie, twin boys who were born in August 2015. Amber worked with the Nebraska Department of Health and Human Services (DHHS) beginning in September 2015 on a voluntary case due to the unsanitary conditions of her home. The voluntary

case was closed in January 2016, after Amber was able to demonstrate that she could keep her house clean for 30 days.

On April 1, 2016, Scottsbluff police responded to Amber's residence for a welfare check and discovered it had returned to a cluttered and unsanitary condition. There were boxes, clothing, and food spread throughout the residence, and the responding officer noticed a prescription medicine bottle on the living room floor. There was a bottle of bleach laying on the kitchen floor and moldy cheese, meat, and carrots in the refrigerator. The residence had a heavy odor of urine and feces. The stairs and bedroom were similarly cluttered with boxes and clothing. There was dog feces on the floor in the children's playroom and urine and dog feces on the floor in the bathroom. Hunter and Opie were removed from Amber's care at that time and placed with their maternal aunt. Amber was ultimately convicted of child neglect based on the condition of the residence and sentenced to probation.

The same day the children were removed, the State filed a petition to adjudicate them under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). At the adjudication hearing, Amber admitted the first count in the petition which alleged that the children lacked safe and sanitary housing, and the children were adjudicated.

Around September 2016, the children were placed back in Amber's home. On October 13, Scottsbluff police were dispatched to Amber's home because Opie had become strangled in a cord. Although the cord wrapped around his neck twice and around his arm once, he escaped serious injury. While at the residence, the officer noted there Amber's home was once again cluttered. Amber explained to him that she heard Opie crying through the baby monitor, but it took her approximately a minute to reach him due to the clutter in the residence.

The same officer responded to Amber's home on November 19, 2016, as a result of a child abuse and neglect intake, reporting, among other concerns, a bad odor coming from Amber's residence. Because of the present juvenile case, the children's guardian ad litem also contacted police around the same time with respect to the conditions of the residence. Upon walking into the residence, the responding officer could smell old food and saw multiple dishes with food remnants on them. He observed a baby bottle on the edge of the kitchen counter with old, chunky milk in it, which had a bad odor to it. There was a cat upstairs, and the litter box had an odor to it, and the officer saw food that had spilled and been mashed into the floor. The twins' bedroom was so cluttered he could barely maneuver through it. Amber's room was essentially being used as a storage room, and sleeping on the bed would have been impossible. The officer also observed a razor on the edge of the bathroom sink and a butter knife on the living room floor. Based on the condition of the house, the children were again removed from Amber's care.

On February 15, 2017, the State filed the initial motion to terminate Amber's parental rights to Hunter and Opie, and shortly thereafter, the juvenile court appointed a guardian ad litem for Amber. The State filed an amended motion for termination on March 17, alleging that terminating Amber's parental rights was appropriate under Neb. Rev. Stat. § 43-292(2), (5), and (6) (Reissue 2016). Specifically, the petition alleged that Amber had substantially and continuously or repeatedly neglected and refused to give the juvenile or sibling of the juvenile necessary parental care and protection; Amber is unable to discharge parental responsibility because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period; and following a determination that the juvenile is one as

described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family under the direction of the court have failed to correct the conditions leading to the determination. The motion also alleged that terminating Amber's parental rights was in the best interests of the children.

The termination hearing was held on April 10 and 11, 2017. The evidence revealed that as the case progressed, concerns about Amber's mental health arose. Thus, in May and June 2016, Amber underwent a psychological evaluation with a focus on parental capacity with licensed clinical psychologist, Dr. Gage Stermensky. Amber reported to Dr. Stermensky that she has a history of mental health concerns, including diagnoses of ADHD, major depressive disorder, anxiety, posttraumatic stress disorder, obsessive compulsive disorder, and borderline personality disorder. Amber reported that she had previously taken medications long-term but has since discontinued them because she no longer needs them and has no symptoms. Dr. Stermensky noted that in his career, he has rarely observed a multitude of mental health disorders and medication management spanning several years which no longer require medication.

Amber acknowledged that she has always been a hoarder and struggled with keeping her house clean. She informed Dr. Stermensky that her mother was also a hoarder. As part of his assessment, Dr. Stermensky went to Amber's home where he noticed significant clutter, and the clutter in the children's bedroom was extremely concerning to him.

Based on his evaluation of Amber, Dr. Stermensky diagnosed her with hoarding disorder and borderline personality disorder in addition to her historical diagnoses. He explained that treating hoarding disorder is a long process, requiring long-term therapy, and is complicated by Amber's personality disorder symptoms, which will also require long-term treatment. Additionally complicating Amber's treatment prognosis is what Dr. Stermensky referred to as "egosyntonic tendencies." This means that Amber cannot recognize problematic or maladaptive aspects of her personality that she needs to work on. In other words, she does not notice that there is anything wrong or see a need to change. Dr. Stermensky noted that Amber continues to lack insight or coping skills to address hoarding behaviors, obsessions, and/or compulsions associated with these behaviors. So the prognosis for her is more problematic and long-term than for someone who does not have egosyntonic tendencies.

In addition, hoarding disorder can be long-term and very individualized based upon the patient's level of motivation and response and whether he or she is able to seek out and comply with service recommendation. When asked whether Amber had the necessary motivation in treating her hoarding disorder, Dr. Stermensky responded, "Sometimes, not usually." Thus, he assessed Amber's prognosis as guarded to poor regarding her efforts to improve based on her lack of improvement thus far during the case. In order to make progress, he opined that Amber will need services two times a week focused on dialectic behavioral therapy and therapy for borderline personality disorder as well as multi-level cognitive interventions and medication management.

Dr. Stermensky concluded that Amber will require treatment and support prior to being able or ready to care for herself and her children independently with a specific focus on hoarding and storage. He opined that she will need to demonstrate that she is able to effectively keep a clean and organized home for a significant length of time before being able to retain independent custody of her children. He cautioned that, if other people are helping Amber clean her home and she needs that support on an ongoing basis, there has not been much symptom improvement from

psychological or cognitive behavioral means. It did not appear to him that Amber had yet been able to ameliorate her hoarding behaviors.

Amber began individual therapy sessions in January 2017. As of the date of the termination hearing, she had completed 12 sessions, with the primary focus on borderline personality disorder and hoarding behaviors. The therapist testified that thus far, Amber had been engaged and participating in the sessions and had achieved the first set of goals set for her.

Consistent with Dr. Stermensky's observations, the DHHS case manager and family support worker testified that throughout their work with Amber during the case, she was never able to consistently maintain a clean and sanitary residence. The case manager typically visited Amber's residence once or twice per month, and the family support worker was in the home two to four times per week. The support worker would frequently discuss the cleanliness of the home with Amber and offer direction to her such as suggesting that she should pick up dirty diapers from the floor; she also suggested putting a trash can in the children's room to make disposing of diapers easier. DHHS purchased three large totes to help with storage, but according to the case manager, the totes did not appear to make much of a difference. Both workers described the home as consistently "cluttered" with food, dirty diapers, garbage, and animal feces on the floor.

Amber repeatedly denied there was an issue with her home and often found excuses as to why her house was not clean. On the day the children were removed from the home in November 2016, Amber's response was that the condition of the home was "fine." Despite this, she often had friends or family assist her in cleaning up the house, but there was never a time when the case manager was working the case that Amber cleaned the house herself. Neither the case manager nor the support worker believed that there were any additional services that could have been provided to Amber. Photographs were received into evidence at the termination hearing depicting the cluttered, unsanitary condition of the residence in April and November 2016 and February 2017.

The juvenile court subsequently entered an order terminating Amber's parental rights to Hunter and Opie. The court determined that the State proved by clear and convincing evidence that termination was warranted under § 43-292(2), (5), and (6) and that terminating Amber's parental rights was in the best interests of the children. Amber appeals.

## ASSIGNMENTS OF ERROR

Amber assigns, summarized and restated, that the juvenile court erred (1) in finding sufficient evidence to support termination of her parental rights under § 43-292(2), (5), and (6) and (2) in finding termination was in the best interests of the children.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

*Statutory Grounds for Termination.*

Amber assigns that the juvenile court erred in finding sufficient statutory grounds to terminate her parental rights. We disagree.

Termination of parental rights is warranted whenever one or more of the statutory bases provided in § 43-292 is established and termination is in the children's best interests. The juvenile court found sufficient evidence to terminate Amber's parental rights to the children under § 43-292(2), (5), and (6). Section 43-292(5) allows termination of parental rights when the parents are "unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period."

The record reveals that Amber has a history of mental health concerns, including historical diagnoses of ADHD, major depressive disorder, anxiety, posttraumatic stress disorder, obsessive compulsive disorder, and borderline personality disorder. Based on his evaluation of Amber, Dr. Stermensky diagnosed her with hoarding disorder and borderline personality disorder. These disorders will require long-term treatment in the form of medication and behavioral interventions, and treating the hoarding disorder is complicated by the personality disorder symptoms. Further complicating matters is Amber's lack of insight into her need for change and the fact that she only "sometimes, not usually" displays the necessary motivation to treat her hoarding disorder. Thus, her prognosis is more problematic and long-term than for someone who has the ability to recognize the need to change, and it is evident from Dr. Stermensky's report and testimony that there are reasonable grounds to believe that her conditions will continue for a prolonged indeterminate period.

It is also clear that Amber's mental deficiencies are rendering her unable to discharge her parental responsibilities. Each witness who assisted Amber during the case explained the cyclical nature of the state of Amber's residence. She would have friends or family assist her to minimally improve the condition of the house, but shortly thereafter, it would return to its cluttered and unsanitary condition, which was unfit for two toddler children. The clutter in the home delayed her ability to respond to Opie's cries when he became strangled by a cord, and the children lack sufficient and safe space to play in the home, especially now that they are toddlers and have become more mobile. Based on our de novo review of the record, we conclude that the State produced clear and convincing evidence to support terminating Amber's parental rights under § 43-292(5).

Our finding that the State has established that termination was warranted pursuant to § 43-292(5) makes it unnecessary to address the issue of whether § 43-292(2) or (6) provides an additional basis for termination of Amber's parental rights to Hunter and Opie. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016). We accordingly affirm the juvenile court's finding that a statutory basis exists for termination of Amber's parental rights.

*Best Interests.*

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747

(2012). Amber argues that the evidence fails to establish that terminating her parental rights is in the children's best interests. We do not agree.

In *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003), where the child was adjudicated on the basis of an unclean house, the Nebraska Supreme Court stated that the "conditions observed in the house were only a symptom of the problems which led to the adjudication and the subsequent plans for reunification. They did not represent a situation which could be remedied by simply hiring a cleaning service." *Id.* at 164, 655 N.W.2d at 685. The court recognized that the condition of the home was merely a manifestation of the parents' inability to properly care for their children. See *In re Interest of Ty M. & Devon M., supra.*

Similarly here, the record makes clear that the condition of the residence is a result of Amber's mental health issues and that addressing those issues will be a long-term process. It is clear that Amber loves her children and shares a bond with them. However, Dr. Stermensky explained that growing up in cluttered houses like Amber's allows children less opportunity to explore their environment in order to develop skills such as motor functioning and psychosocial skills, and the children are at risk for injury and illness. Cluttered homes also impede children's ability to explore their environment in a safe manner, which is important for them to be able to form abstract reasoning abilities and feelings of safety.

There are reports to DHHS with respect to the unsanitary condition of Amber's residence dating back to August 2012, and DHHS has been assisting Amber since at least September 2015. As of February 2017, there had been no significant or consistent improvement; the residence was still cluttered and dirty, and DHHS representatives did not believe there were any additional services that could be offered to Amber.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Shane L. et al.*, 21 Neb. App. 591, 842 N.W.2d 140 (2013). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Based upon our de novo review of the record, we conclude that the State provided clear and convincing evidence to establish that terminating Amber's parental rights was in the children's best interests.

CONCLUSION

We conclude that the evidence was sufficient to establish that terminating Amber's parental rights to Hunter and Opie was appropriate under § 43-292(5) and that termination of Amber's parental rights was in the best interests of the children. We therefore affirm the order of the juvenile court.

AFFIRMED.