In re Interest of Jamie P., a child under 18 years of age.
State of Nebraska, appellee, v. Alan C., appellee,
and Rhonda P., intervenor-appellant.
670 N.W.2d 814

Filed November 10, 2003.  No. A-02-1259.

Leslie A. Christensen and James Crampton for appellant.

James S. Jansen, Douglas County Attorney, Shawn R. Hagerty, and Kelli Wiehl, Senior Certified Law Student, for appellee State of Nebraska.

Kelly T. Shattuck, of Cohen, Vacanti, Higgins & Shattuck, for appellee Alan C.

Irwin, Chief Judge, and Sievers and Moore, Judges.

Moore, Judge.

## INTRODUCTION

Rhonda P., the natural mother of Jamie P., appeals from an adjudication in the separate juvenile court of Douglas County on

a petition filed by the State. The State's petition alleged that Jamie was a minor within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) as a result of the actions of Alan C., Jamie's natural father, in that Alan had subjected Jamie to inappropriate sexual contact, placing her at risk for harm. Rhonda was granted leave to intervene in the matter. The juvenile court dismissed the charge in the State's petition relating to Alan's inappropriate conduct and terminated the jurisdiction of the court. Rhonda appeals, alleging that she was denied procedural due process in connection with her intervention, that the court erred in excluding from evidence statements Jamie allegedly made while asleep, and that the court erred in failing to find that there was sufficient evidence that Alan had inappropriately touched Jamie. For the following reasons, we affirm.

## BACKGROUND

We initially note that at the time the juvenile court became involved in this matter, Rhonda and Alan were involved in a district court custody proceeding that had been pending for approximately 1 year. The district court proceeding was scheduled for trial in January 2002 but was apparently continued at Rhonda's request. The parties in the juvenile court matter acknowledged that Alan had had custody of Jamie pursuant to an order of the district court from approximately May or June 2001 until February 2002, when Jamie was placed in the custody of the Nebraska Department of Health and Human Services (the Department) by the juvenile court.

Rhonda had had supervised visitation with Jamie through the district court custody proceedings. Alan testified in the present matter that after the district court ordered this supervised visitation, Rhonda did not exercise her visitation rights for approximately 1 month. Alan did allow Rhonda to have one overnight unsupervised visitation with Jamie in February 2002 due to a special family event of Rhonda's. During that visitation, Jamie's half sister, Jessica P., allegedly overheard statements made by Jamie while Jamie was sleeping; Jamie allegedly stated, " 'Daddy stop' " and " 'I don't like sex' " while making a "humping" motion with her body. The next day, or shortly thereafter, Rhonda took Jamie to a hospital for a physical examination due

to her concerns that Alan had sexually abused Jamie. An officer from the Omaha Police Department also responded and interviewed Jamie, taking her into protective custody and placing her with Rhonda. The doctor who examined Jamie found no signs of trauma on her. Det. Richard Mahoney of the child victim section assault unit of the Omaha Police Department interviewed Jamie and Rhonda on March 1. Jamie indicated to Mahoney that Alan had licked her all over and rubbed the private parts of her body. Mahoney indicated that Jamie was "age appropriate" in her responses to his questions, but he did not find her to be believable and described her claim as "farfetched." Another doctor conducted a physical examination of Jamie at this time and was unable to find any evidence of sexual trauma. In addition to Jamie and Rhonda, Mahoney interviewed Alan and two other individuals who had allegedly been present during the inappropriate sexual contact. Alan and the two other individuals denied the allegations of sexual abuse. At the conclusion of his investigation, Mahoney determined that there was insufficient evidence for any criminal charge to be filed against Alan.

Randy McCarty, a child protection safety worker with the Department, performed an initial assessment on the family in March 2002. McCarty reviewed police reports and interviewed Mahoney, Rhonda, and Alan. McCarty's recommendation at the time of her initial assessment was that Jamie not be returned to Alan's custody despite the lack of substantiated evidence of abuse. Due to the allegations that had been made in the juvenile case as well as certain concerns raised with regard to Rhonda in the district court case, McCarty felt it would be best for Jamie to be placed in a neutral setting.

The State filed a petition in the juvenile court on February 25, 2002, alleging that Jamie came within the meaning of § 43-247(3)(a) by virtue of being under the age of 18 and because Alan had placed her in a situation dangerous to life or limb or injurious to her health or morals. Specifically, the petition alleged that Alan had subjected Jamie to inappropriate sexual contact, placing her at risk for harm. Upon the State's motion, the juvenile court entered an order for immediate custody on February 25, granting custody of Jamie to the Department for placement in foster care or other appropriate placement.

On March 25, 2002, Rhonda filed a motion for leave to intervene and for review of Jamie's detention. Rhonda sought an order granting her such leave, permitting her to participate fully in the adjudication process, and placing Jamie in her custody. Rhonda's motion was heard on April 2. At the April 2 hearing, Rhonda's attorney indicated that he had an intervenor's petition to file on Rhonda's behalf. Upon the court's inquiry, the attorneys for Alan and the State and the guardian ad litem all indicated that they did not object to Rhonda's motion for leave to intervene, and the intervenor's petition was filed on April 2 as well. Rhonda indicated within the petition that it had been filed with the consent of the county attorney pursuant to Neb. Rev. Stat. § 43-274 (Reissue 1998). Rhonda further alleged therein that Alan had placed Jamie at risk for harm by subjecting her to inappropriate sexual contact, by driving with her in his vehicle while his license was under suspension, by allowing her to smoke cigarettes, and through his use of alcohol and pornography. Rhonda attached to the petition affidavits from herself and Jessica detailing Alan's alleged misconduct and the alleged reports of inappropriate sexual contact with respect to Jamie. The juvenile court entered an order on April 17, granting Rhonda's motion for leave to intervene upon finding that there were no objections to Rhonda's motion. The court also granted Rhonda's motion for placement of Jamie with her, finding that Jamie should remain in the temporary custody of the Department with placement to include Rhonda's home.

Adjudication hearings on the State's petition were held on July 18 and 19 and September 13, 2002. Prior to the start of the July 18 hearing, an in-chambers conference was held, wherein the status of Rhonda's intervenor's petition was discussed. Rhonda maintained that when the intervention was granted, she was also given authorization to file a petition. The county attorney indicated no recollection of having authorized the filing of a petition. The court continued the matter of Rhonda's petition to allow the preparation of a transcript of the April 2 hearing. Our record contains the transcript from the April 2 hearing and does not show that consent was given by the county attorney to the filing of a petition by Rhonda. On July 19, Rhonda filed a pleading entitled "Motion for Leave to File Answer and Affirmative Allegations or

Alternatively, to Adjudicate the Allegations in the Intervenor's Petition." Rhonda filed an answer and affirmative allegations on July 19 as well. The juvenile court entered an order on July 23, denying Rhonda's motion for leave to file an answer and affirmative allegations.

The State and Alan called witnesses to testify at the adjudication hearings. The witnesses called by the State and Alan were also questioned by Rhonda's attorney and the guardian ad litem. In addition to the above evidence, evidence was adduced as indicated below.

Jamie was questioned by the court in chambers in the presence of the guardian ad litem and the attorneys for Rhonda and Alan regarding her ability to distinguish right from wrong. Upon the close of this questioning, the court inquired whether the attorneys were satisfied with Jamie's ability. Alan's attorney expressed some concerns given Jamie's age and maturity level, but the attorneys generally agreed that Jamie had done fairly well for a child of her age and that they would rely on the court's judgment to address any particular concerns encountered in Jamie's testimony. Based upon that understanding, counsel for the various parties proceeded to question Jamie. We note that Jamie was born on October 16, 1996, so at the time of her testimony on July 18, 2002, she was almost 6 years old and was in kindergarten.

The State inquired whether Alan had ever done anything to Jamie that she did not like, to which Jamie responded that Alan "[l]icked [her] around [her] body." Jamie indicated that this had occurred in the garage at Alan's house and that it had occurred more than one time. Jamie indicated that Alan had not licked or touched her "private parts." Jamie stated that she told "[Rhonda] and the doctors" about the licking. Alan's attorney inquired as to whether anyone had previously told Jamie anything about the adjudication hearing. Jamie indicated that she was told "[n]othing" by Rhonda and Jessica about the court hearing other than that she was going to have to go to court on the day of the hearing and that "the judge [was] going to ask [her] what [Alan] did to [her]." Alan's attorney also inquired whether Rhonda or Jessica had told Jamie that Alan had done something wrong to her, to which Jamie replied, "Yes." Jamie indicated that Rhonda or Jessica had told her "[o]ne or two or three" times that Alan had

done something wrong to her, but that Rhonda had not said that Alan was a bad person. Upon questioning by Rhonda's attorney, Jamie denied that Rhonda had told her what to say in court and further indicated that she was telling the truth. The guardian ad litem inquired whether Alan had licked Jamie on her feet, shoulders, head, back, legs, and chest, to which Jamie affirmatively responded except as to her head. Jamie further testified, "Every time that he did it I fe[lt] sad." Upon further questioning by Alan's attorney, Jamie agreed that Alan picks her up, blows on her stomach, tickles her, and kisses her. Jamie agreed that Alan does this because he loves her. Jamie indicated that she did not think it was "bad" for Alan to kiss her on her cheek but that it was "bad" if he kissed her anywhere else.

Jessica was called by the State as a witness. Jessica was 19 years old at the time of the hearing and resided with Rhonda. Jessica testified concerning the incident that allegedly occurred during the overnight visitation that Rhonda had with Jamie on the weekend of February 22, 2002. Jessica testified that she allowed Jamie to sleep with her on that occasion because Jamie did not like to sleep alone. Jessica and Jamie went to bed around 10:30 or 11 p.m. Jessica woke up around 1:30 a.m. and went to the bathroom. Jessica indicated that she heard Jamie "let out a weird cry" as she was returning to the bedroom. Jessica testified that after she had returned to the bedroom, she heard Jamie state something to the effect of " 'Daddy stop' " and " 'I don't like sex' " and saw that Jamie then started "moving her butt up and down." Alan's attorney and the guardian ad litem objected to this testimony on the ground that it was hearsay. The State's and Rhonda's attorneys argued that the statements allegedly made by Jamie, as testified to by Jessica, either were not hearsay or, if they were hearsay, fell under the excited utterance exception to the hearsay rule. After further argument from the parties and additional testimony from Jessica, the court took the matter under advisement.

Dr. Joseph Rizzo, a clinical psychologist, was called as a witness by Alan. Rizzo conducted a psychological assessment of Alan to evaluate whether Alan fit the profile of an individual who sexually abuses children. Rizzo's assessment included a clinical interview and history and the completion of various psychological tests and standard forms by Alan. The history obtained by

Rizzo from Alan included Alan's past treatment for substance abuse, past charges of driving under the influence of alcohol, sexual history, use of pornography, and present alcohol use. Rizzo opined, based on his interviews with and testing of Alan, that Alan's profile was not consistent with the profile of a child molester. Rizzo expressed concerns about the present child abuse charges' having arisen in the context of a custody proceeding, citing published material in his field indicating that 90 percent of sexual abuse allegations in ongoing custody cases are false. Upon cross-examination, Rizzo admitted that he had not found the 90-percent figure to be accurate in his own clinical experience but stated that he had accepted this figure as "a caution" in situations similar to the present case.

Tyrie Cook, a human services worker, was called as a witness by Alan. Cook serves as a visitation specialist, taking children who are in foster care to visit their biological parents. Cook had served as the visitation specialist for Alan since May 2002, taking Jamie to see Alan twice a week. Cook testified that Jamie and Alan had a good relationship, that Jamie did not appear to be frightened or scared to have contact with Alan, and that all the touching and other contact that occurred during visits appeared to be appropriate.

Rhonda testified about, among other things, an incident that had occurred in approximately August 2001 between Jamie and a young neighborhood boy while Jamie was in Rhonda's care. Rhonda testified that she observed Jamie and the boy leaving a neighbor's garage and that when she asked Jamie what they had been doing, Jamie indicated that the boy had lifted up her dress. Alan's recollection of the incident differed from Rhonda's. Alan testified that after the incident occurred, Rhonda informed him that two boys had been involved, that they had pulled down Jamie's panties, and that they had touched Jamie's bottom, chest, and private areas. Alan indicated that he took Jamie to a psychologist and a medical doctor following this incident and that Jamie indicated at the time that there had been physical contact between her and the boy (or boys). Apparently, Rhonda resolved the incident by speaking to the boy's (or boys') mother. The record is not clear as to the results of any medical examinations that were conducted following this incident.

Alan denied ever inappropriately touching Jamie. Alan also denied ever having problems with Jamie's making up stories or being untruthful. Alan testified that he had kissed Jamie but never in any inappropriate places and that Jamie had kissed him. Alan testified that Jamie would know the difference between a kiss and a lick.

The juvenile court entered an order on October 21, 2002, finding that the statements Jamie made while asleep, as testified to by Jessica, did not fall under the hearsay exception as set forth in Neb. Rev. Stat. § 27-803(1) (Cum. Supp. 2002). The court further found that the statements were not permitted under § 27-803(23) because under the totality of the circumstances, the statements lacked the requisite degree of reliability or trustworthiness. The court also found that the prejudicial nature of the statements outweighed their probative value. The court dismissed the charge in the petition relating to Alan's inappropriate conduct, relieved the Department of any further responsibility in the matter, and terminated the jurisdiction of the court. Subsequently, Rhonda perfected her appeal to this court.

## ASSIGNMENTS OF ERROR

Rhonda asserts that she was denied due process when the juvenile court did not allow her intervenor's petition and did not consider her affirmative allegations. Rhonda further asserts that the juvenile court erred in (1) excluding Jessica's testimony regarding the statements Jamie made while asleep and (2) failing to find that there was sufficient evidence that Alan had inappropriately touched Jamie.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Michael R.*, 11 Neb. App. 903, 662 N.W.2d 632 (2003).

■ In reviewing questions of law arising under the Nebraska Juvenile Code, an appellate court reaches conclusions independent

of the lower court's ruling. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003).

## ANALYSIS

*Due Process.*

■ Rhonda first asserts that she was denied due process when the juvenile court did not allow her to proceed on her intervenor's petition and did not consider her affirmative allegations. Rhonda relies on Neb. Rev. Stat. § 25-328 (Reissue 1995) (since amended, operative January 1, 2003, to replace word "petition" with "complaint"), which provided:

> Any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, in any action pending or to be brought in any of the courts of the State of Nebraska, may become a party to an action between any other persons or corporations, either by joining the plaintiff in claiming what is sought by the petition, or by uniting with the defendants in resisting the claim of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, either before or after issue has been joined in the action, and before the trial commences.

The interest required as a prerequisite to intervention under § 25-328 is a direct and legal interest of such character that the intervenor will lose or gain by the direct operation and legal effect of the judgment which may be rendered in the action. *In re Interest of Kayle C. & Kylee C.*, 253 Neb. 685, 574 N.W.2d 473 (1998). A person seeking to intervene in an action must allege facts showing that he or she possesses the requisite legal interest in the subject matter of the action. *Id.*

Rhonda was, in fact, granted the right to intervene and participate in the present matter. Rhonda argues, however, that she should have been allowed to proceed on her intervenor's petition,

which she alleged was filed with the consent of the county attorney pursuant to § 43-274. Section 43-274(1) provides in relevant part:

> The county attorney *or any reputable person residing in the county, with the consent of the county attorney,* having knowledge of a juvenile in his or her county who appears to be a juvenile described in subdivision (1), (2), (3), or (4) of section 43-247[,] may file with the clerk of the court having jurisdiction in the matter a petition in writing specifying which subdivision of section 43-247 is alleged, setting forth the facts verified by affidavit . . . .

(Emphasis supplied.)

In *In re Interest of Joelyann H.*, 6 Neb. App. 472, 574 N.W.2d 185 (1998), this court considered a petition, filed by the court-appointed guardians of a child pursuant to Neb. Rev. Stat. § 43-292 (Reissue 1993), to terminate the parental rights of the child's natural mother. The juvenile court terminated the natural mother's parental rights, and she appealed to this court. Proceedings in that case began at the dispositional phase with a hearing on the guardians' petition to terminate the natural mother's parental rights. We held that the juvenile court lacked jurisdiction over the child and that the order terminating the natural mother's parental rights was a nullity because the guardians' petition was not an adjudication petition as specified in § 43-247. This court further stated:

> Even if we were to somehow construe the petition filed by [the guardians] as a petition for adjudication pursuant to § 43-247, it would be deficient. [Section] 43-274 (Reissue 1993) provides that any such petition must be filed by the "county attorney or any reputable person residing in the county, with the consent of the county attorney." . . . Nothing in the record establishes that this petition was filed by or with the consent of the county attorney.

(Emphasis omitted.) *In re Interest of Joelyann H.*, 6 Neb. App. at 477, 574 N.W.2d at 189.

Our review of the record in the present case reveals that while the county attorney did not object to Rhonda's motion for leave to intervene, there is no evidence to establish that the county attorney consented to the filing of Rhonda's intervenor's petition.

The juvenile court did not err in refusing to allow Rhonda to proceed on her intervenor's petition.

Because Rhonda did not prove compliance with § 43-274, as discussed above, we need not address her due process argument. See *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003) (appellate court not obligated to engage in analysis not needed to adjudicate case and controversy before it).

However, to the extent that Rhonda's due process argument applies to her rights during the adjudication process in general, it is clear that Rhonda was granted the right to intervene and was allowed to participate in the adjudication proceedings. She was present and represented by counsel at all of the hearings. Rhonda was afforded the opportunity to cross-examine witnesses called both by the State and by Alan at the adjudication hearing. We also note that many of the issues raised in Rhonda's petition and affirmative allegations were covered during the course of the adjudication hearings, albeit not in as much detail, perhaps, as Rhonda would have liked. Issues of Alan's alleged inappropriate touching of Jamie and his use of alcohol and pornography were covered during the course of the proceedings. The only issues Rhonda was not allowed to question witnesses over in some detail were whether Alan drove with Jamie in his car while his license was under suspension and whether Alan gave Jamie cigarettes. These issues will most likely be raised and thoroughly examined in the district court custody proceeding pending between Alan and Rhonda. We conclude that Rhonda was not denied her procedural due process rights with respect to the adjudication proceedings.

*Statements Made While Sleeping.*

Rhonda next asserts that the juvenile court erred in excluding Jessica's testimony regarding the statements Jamie made while sleeping. Rhonda argues first that the statements, as testified to by Jessica, are not hearsay and second that if we find that the statements are hearsay, they fall under the excited utterance exception to the hearsay rule.

Neb. Rev. Stat. § 27-801 (Reissue 1995) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." A "statement" is "(a) an oral or written assertion or (b) nonverbal conduct of a person, if it is intended by him as an assertion," and a "declarant" is "a person who makes a statement." *Id.* Rhonda urges that Jessica's testimony of the statements Jamie allegedly made while sleeping should have been admitted because it was not being offered to prove the truth of the matter asserted (namely that Jamie does not like sex), but, rather, was being offered for the nonhearsay purpose of illustrating the statements' effect on the hearer at the time. Rhonda argues that the testimony was offered to explain what prompted Rhonda to take Jamie to be examined at the hospital. However, it is clear that Rhonda wanted the court to draw the conclusion that because Jamie made such statements in her sleep, it was likely that Alan had sexually abused Jamie at some unknown point in time. We conclude that the statements Jamie allegedly made while sleeping, as testified to by Jessica, constituted hearsay.

Alternatively, Rhonda urges that the statements fall under the excited utterance exception to the hearsay rule. Section 27-803 provides, in relevant part:

Subject to the provisions of [Neb. Rev. Stat. §] 27-403 [(Reissue 1995)], the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition;

. . . .

(23) A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact, (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The juvenile court found that the statements Jamie made while sleeping, as testified to by Jessica, did not fall under the hearsay exception set forth in § 27-803(1) and likewise were not

permitted under § 27-803(23) because under the totality of the circumstances, the statements lacked the requisite degree of reliability or trustworthiness. The court also found that the prejudicial nature of the statements outweighed their probative value. See Neb. Rev. Stat. § 27-403 (Reissue 1995).

We have found no Nebraska cases considering the question of the admissibility of testimony of statements made while the declarant was sleeping or unconscious; however, this is a question that has been considered by other jurisdictions with varying results:

In light of the numerous exceptions to the rule barring the admission of hearsay statements, a question has arisen in a number of cases concerning the admissibility of testimony or other evidence of words or declarations which were spoken while the declarant was partly conscious, totally unconscious, or asleep. In considering this question, the courts have been guided by two rather contradictory views as to the nature of statements made by sleeping or unconscious persons. On the one hand, such statements may be regarded as nothing more than utterances made without any reasoning, and no more trustworthy than the statements of an insane person. However, since the sleeping or unconscious person obviously has no opportunity to falsify his statements, they may be regarded as being particularly apt to be truthful. Consequently, some courts have maintained that because the statements are uttered in the absence of reasoning capacities, they do not reflect the true thoughts of the declarant concerning actual events, and they consequently are not admissible in evidence . . . . Other courts have reasoned that the statement of a sleeping person was not admissible on the ground that since only the voluntary statements of an individual may be introduced against him, and since the sleeping declarant could not control his utterances, the admission of testimony concerning the statements would violate the declarant's right against self-incrimination . . . . On the other hand, a number of courts have reasoned that the statements of a sleeping or unconscious person, which would not have been admissible by reason of being a hearsay utterance if the declarant was

awake at the time it was spoken, are in fact admissible, since they could not have been falsified by the unconscious or sleeping declarant . . . . Still other court[s] have declined to take a position on the general trustworthiness of such statements, but have admitted evidence as to them and left it for the jury to weigh the evidence's value . . . . And a few courts have held evidence as to particular statements admissible . . . or inadmissible . . . without commenting upon the general admissibility of such evidence.

Annot., 14 A.L.R.4th 802, § 2 at 804 (1982).

In some jurisdictions, the expressions of a person made while asleep are not admissible as spontaneous statements, since they proceed from an unconscious and irresponsible condition. It has been said that such expressions have little or no meaning, are as likely to refer to unreal facts or conditions as to things real, and are wholly unreliable, and a jury ought not to be allowed to guess that such expressions are produced by a present mental or physical condition. The same reasoning has been applied to an utterance offered as a spontaneous statement made by a person while unconscious by reason of an injury. But the view has also been followed, in some instances, that there should be no question as to the competency of a spontaneous statement because of an alleged unconscious state of the declarant, unless the language is incoherent and the speaker delirious.

29A Am. Jur. 2d *Evidence* § 877 at 299-300 (1994).

As indicated in the references quoted above, there is no uniformity with respect to either outcome or analytical approach among the states that have addressed the admissibility of testimony of statements a person made while sleeping. Nonetheless, as did the juvenile court in the present case, a number of states have found "sleep talk" evidence inadmissible due to its lack of reliability. See, e.g., *Commonwealth v. Almeida*, 433 Mass. 717, 746 N.E.2d 139 (2001) (testimony of sleep talk inadmissible; circumstances surrounding declaration lacked requisite degree of trustworthiness, and prejudicial nature of declaration outweighed minimum probative value); *State v. Zimmerman*, 121 Idaho 971, 829 P.2d 861 (1992) (testimony of sleep talk inadmissible; not relevant due to lack of probative value regarding actual events

and inherent unreliability); *State v. Presley*, 108 Or. App. 149, 814 P.2d 550 (1991) (relevance of sleep talk not established because of failure to demonstrate nexus between child's vocalization and alleged incidents).

We conclude that under the circumstances surrounding the alleged statements made by Jamie while she was asleep, her statements, as testified to by Jessica, are not excited utterances admissible under § 27-803(1) and do not contain sufficient indicia of their reliability to be admissible under § 27-803(23). Further, we agree with the juvenile court's conclusion that even if the statements were relevant, their prejudicial nature outweighed their probative value. See § 27-403. The juvenile court did not err in excluding Jessica's testimony of these statements from evidence. Rhonda's assignment of error is without merit.

*Sufficiency of Evidence.*

Finally, Rhonda asserts that the juvenile court erred in failing to find that there was sufficient evidence that Alan had inappropriately touched Jamie. Rhonda acknowledges that while an appellate court is required to reach a conclusion independent of the juvenile court's findings, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Michael R.*, 11 Neb. App. 903, 662 N.W.2d 632 (2003). Rhonda argues generally that the record in this case is sufficient to establish that Alan inappropriately touched Jamie "as far as the State's case is concerned." Brief for appellant at 16. Rhonda specifically argues that because the juvenile court did not hear testimony from or have the opportunity to observe Rhonda's own witnesses and did not hear her evidence supporting both the State's and her own allegations, the record was incomplete and the trial fatally flawed. We have already concluded that Rhonda's due process rights were not violated when the juvenile court did not allow her to proceed with her intervenor's petition and affirmative allegations against Alan. As to the allegations against Alan in the State's petition, there was conflicting evidence presented. The juvenile court had the opportunity to hear the evidence and observe the witnesses presented by the State and by Alan and clearly accepted a version of

the facts favorable to Alan. Rhonda had every opportunity to cross-examine these witnesses on the allegations raised in the State's petition. Our de novo review of the record leads us to conclude that the juvenile court did not abuse its discretion in dismissing the State's petition. Rhonda's final assignment of error is without merit.

## CONCLUSION

We conclude that Rhonda was not denied her procedural due process rights with respect to the adjudication proceedings by virtue of the juvenile court's decision not to allow Rhonda to proceed on her intervenor's petition and affirmative allegations. We further conclude that the juvenile court did not err in excluding testimony of the statements allegedly made by Jamie while sleeping from evidence. Finally, we conclude that the juvenile court did not abuse its discretion in dismissing the State's petition.

AFFIRMED.