IN RE INTEREST OF BROOK P. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
V. NATHAN P., APPELLANT, AND ROBYN P., APPELLEE
AND CROSS-APPELLANT.
634 N.W.2d 290

Filed October 2, 2001.   No. A-01-129.

Patrick L. Neid for appellant.

Denise D. Myers for appellee Robyn P.

Robert J. Cashoili, Deputy Hall County Attorney, for appellee State, and Arthur S. Wetzel, guardian ad litem.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

Nathan P. and Robyn P. appeal the termination of their parental rights to their three children by the Hall County Court, sitting as a juvenile court. Nathan and Robyn allege that the juvenile court's failure to advise them at a prior adjudication hearing of the possibility of losing their parental rights, before they admitted the allegation in the juvenile petition, results in a lack of jurisdiction in the subsequent parental rights termination proceeding.

## FACTUAL BACKGROUND

Nathan and Robyn are the parents of Brook P., Tanner P., and Molly P. In 1993, when Robyn was 19, she was anorexic and bulemic, was hospitalized for attempting suicide through overdose, and was diagnosed with dependent personality disorder. While living with her parents in Grand Island, Nebraska, Robyn gave birth to her and Nathan's daughter, Brook, on January 11, 1994. Nathan was not immediately aware of the birth because he was incarcerated in Lincoln, Nebraska, on burglary and assault charges. After his release, Nathan and Robyn married, and they moved in with Nathan's parents in Kearney, Nebraska.

On May 26, 1995, the Department of Social Services received a telephone call from one of Robyn's family members concerning Robyn's alleged neglect of Brook. Robyn admitted to a department caseworker that she was using drugs while Brook was in the apartment. Robyn told the caseworker that Nathan would lock her in the apartment and that she had been injecting a gram of methamphetamine four or five times a day. The house was dirty and cluttered. Later, the caseworker spoke to Nathan and Robyn, and Nathan told her that he had been through inpatient treatment for drug and alcohol problems on five occasions. At this time, Brook was essentially living with her maternal grandparents.

On July 26, 1995, the caseworker visited the home again because of concerns that Robyn was using drugs and because Robyn was considering divorcing Nathan, which would likely disrupt any stability in the home. Upon Nathan and Robyn's request for assistance, the caseworker helped Nathan and Robyn find a more suitable apartment. The Department of Social Services assigned a family support provider to teach Nathan and

Robyn budgeting and household maintenance and to ensure that they attended drug and alcohol support groups. The department also allocated resources to help both Nathan and Robyn maintain employment. This voluntary case was closed in October 1995, as the caseworker determined that Nathan and Robyn had stabilized their lives and were appropriately caring for Brook. Robyn gave birth to another child, Tanner, on April 27, 1996.

Between 1995 and 1997, Nathan and Robyn sporadically used drugs. On January 23, 1997, the family was driving to Kearney from their home in Grand Island when Nathan and Robyn argued about their drug use. After Nathan pulled the vehicle over to the side of the road, Robyn attempted to leave the car with Brook and Tanner. Nathan tried to restrain Robyn, bloodying her nose. As a result, he was arrested for domestic abuse. The authorities at the scene found that the children were inadequately dressed for the cold weather. An investigation showed that Nathan and Robyn were heavily using drugs, had received an eviction notice from their mobile home, and were frequently relying on the maternal grandparents to care for their children. Brook was reportedly having nightmares and was afraid of Nathan.

Brook and Tanner were removed from Nathan and Robyn's care, they were adjudicated as children within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1998), and a juvenile case plan was developed to help reunify them with Nathan and Robyn. Nathan and Robyn were found to have methamphetamine dependence, a marital relational problem, and a parent/child relational problem. Both received chemical dependency counseling. Robyn's random urinalysis tests were negative, whereas no evidence of Nathan's urinalysis tests are in the record because it was the responsibility of his probation officer to order such tests. Both worked at solving their marital problems. But by July 1997, Nathan attended counseling sessions less frequently, ostensibly due to his work schedule. Nathan and Robyn were then referred to an intensive family preservation program to improve their parenting skills and financial management. The program included in-home visits with the entire family, as Brook and Tanner had been returned to Nathan and Robyn's care in October 1997.

Nathan relapsed and used drugs again in March 1998 and apparently failed to comply with the case plan's requirements of attending narcotics anonymous meetings. Robyn entered the recommended codependency counseling program and received mental health counseling in April. She began to take classes toward a nurse's aide degree while working and living with her parents. The juvenile case was dismissed in October. In November, Nathan and Robyn divorced. Robyn ceased codependency counseling of her own accord in January and reunited with Nathan on January 1, 1999. She also stopped attending classes. Molly was born February 13, 2000.

On June 8, 2000, Nathan called the Nebraska State Patrol to report that he and Robyn had used methamphetamine a few times in the past few months and that he did not think that they could care for their children. Nathan reported that Molly was in the home when both he and Robyn injected drugs the previous evening. At the time, neither Nathan nor Robyn had a job, and they were living in a motel. The children were removed from Nathan and Robyn's home on June 9, placed in the temporary custody of the Department of Health and Human Services, and ultimately placed with their maternal grandparents. Robyn took out a protection order against Nathan in July. Neither was attending narcotics anonymous meetings, but both began to see a therapist to deal with their substance abuse and relationship problems after the children were removed from their home.

A psychotherapist who began working with Brook and Tanner in July 2000 found that they were experiencing anxiety and depression. Brook was very sad, withdrawn, and attempting to "parent" her brother and sister. She told the psychotherapist that being removed from her parents' home was her fault and that if she could be a more perfect child, she would be returned. Tanner was physically aggressive with his sisters and grandparents and very defiant. Brook and Tanner displayed some sexual "acting out." Their behavior improved over the summer, and both children enjoyed visiting their parents. However, the psychotherapist testified at the trial upon the State's motion to terminate Nathan's and Robyn's parental rights that permanency placement was necessary. On July 5, 2000, Nathan's and Robyn's urinalysis tests

showed that they had used drugs the previous day. They admitted to further use in November.

## PROCEDURAL BACKGROUND

The State filed a juvenile petition on June 9, 2000, with the Hall County Court, sitting as a juvenile court, alleging that Brook, Tanner, and Molly were children within the jurisdiction of the juvenile court because they were in a situation dangerous to life or limb, or injurious to their health or morals. In a separate order entered the same date, the court placed the children in the temporary custody of the Department of Health and Human Services. At an initial hearing, on June 19, the juvenile court informed Nathan and Robyn of their rights pursuant to Neb. Rev. Stat. § 43-279.01 (Reissue 1998). While the judge explained that upon adjudication, he could do a number of things as he saw fit, the court did not mention that included in that list of possible consequences was the termination of their parental rights. Nathan and Robyn admitted the allegation in the juvenile petition, and the court deemed their admissions knowingly, voluntarily, and intelligently made. The juvenile court orally found on the record that Brook, Tanner, and Molly were children within § 43-247(3)(a); however, as far as our record reveals, there was never a similar written judgment entered.

On August 29, 2000, the date of the scheduled disposition hearing, the State filed a motion to terminate Nathan's and Robyn's parental rights because of their substantial and continuous or repeated neglect of their children, as well as their habitual use of alcohol or drugs. A journal entry of the same date reports that Nathan and Robyn made an initial appearance before the juvenile court upon the State's motion to terminate their parental rights. The journal entry shows that the juvenile court explained to Nathan and Robyn the nature of the allegations of the motion to terminate parental rights, as well as the consequences, should the court grant the motion. The journal entry further states that both Nathan and Robyn entered a denial of the motion to terminate parental rights.

Trial was held December 7 and 8, 2000. In a journal entry dated December 27, the juvenile court found that Nathan and Robyn had a "long standing and well recognized chemical

dependency problem." Further, the court found that their use of drugs created serious consequences for their children because Nathan and Robyn frequently moved from place to place as a result of being unable to pay the rent and because Nathan was often unemployed. The court noted incidents of domestic violence in the home, at public places, and in the children's presence. Upon this basis, the juvenile court found clear and convincing evidence that Nathan and Robyn substantially and continuously or repeatedly neglected their children, that they were unfit to parent by reason of habitual use of intoxicating liquor or narcotic drugs, and that it was in the children's best interests to terminate Nathan's and Robyn's parental rights. Nathan and Robyn have timely appealed to this court.

## ASSIGNMENTS OF ERROR

In Nathan's appeal and Robyn's cross-appeal, they assign error to the juvenile court's failure to notify them during the initial adjudication that their parental rights could be terminated and allege that this violation of § 43-279.01 prevented the court from acquiring jurisdiction in the instant case. Both Nathan and Robyn also assign error to the juvenile court's determination that they had substantially and continuously or repeatedly neglected their children and refused to give them the necessary parental care and protection, that they were unfit to parent by reason of habitual use of intoxicating liquor or narcotic drugs, and that it was in their children's best interests to terminate their parental rights. Although both Nathan and Robyn argue that the court failed to make reasonable efforts to reunify the family, neither assigned this as error. Errors that are argued but not assigned will not be addressed by an appellate court. See *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995).

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000); *In re Interest of Billie B.*, 8 Neb. App. 791, 601 N.W.2d 799 (1999).

## ANALYSIS

*Failure to Advise of Possible Loss of Parental Rights.*

Nathan and Robyn argue that their due process rights were violated by the juvenile court's failure to inform them at the June 19, 2000, initial adjudication hearing, before their admission of the allegations, that a potential consequence of the court's finding that their children were juveniles within the provisions of § 43-247(3)(a) was that their parental rights could be terminated. At this hearing, both admitted the petition's allegation that their children were in a situation dangerous to life or limb, or injurious to their health or morals. Nathan and Robyn cite § 43-279.01 and *In re Interest of N.M and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992), to support their claim. Section 43-279.01 provides:

(1) When the petition alleges the juvenile to be within the provisions of subdivision (3)(a) of section 43-247 . . . the court shall inform the parties of the:

(a) Nature of the proceedings and the possible consequences or dispositions pursuant to sections 43-284, 43-285, and 43-288 to 43-295. [Sections 43-288 to 43-295 address orders as to juveniles, including possible termination of parental rights.]

. . . .

(2) After giving the parties the information prescribed in subsection (1) of this section, the court may accept an in-court admission. . . .

Interpretation of a statute presents a question of law. *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999). An appellate court reviews questions of law independent of the trial court's decision. *Id.* Section 43-279.01(2) means that a juvenile court should accept a parent's in-court admission only after informing the parties as to the nature of the proceedings and the possible consequences or dispositions, including termination of parental rights. In *In re Interest of N.M. and J.M.*, 240 Neb. at 696, 484 N.W.2d at 81, the court said that "adequate notice of the possibility of the termination of parental rights must be given in adjudication hearings before the juvenile court may accept an in-court admission . . . from a parent as to all or any part of the allegations of the petition before the juvenile court."

■ Therefore, if there had been an appeal of the original adjudication, the juvenile court's failure to inform Nathan and Robyn of the potential consequences of the juvenile proceeding before accepting their admission to the allegations would have been fatal to the adjudication, as the adjudication was based on the parents' admission. This court has similarly ruled. See, *In re Interest of Billie B., supra*; *In re Interest of Joelyann H.*, 6 Neb. App. 472, 574 N.W.2d 185 (1998). However, neither Nathan nor Robyn appealed the juvenile court's initial adjudication. In the absence of a direct appeal from an adjudication order, a parent may not question the existence of facts upon which the juvenile court asserted jurisdiction. *In re Interest of Bryce C.*, 8 Neb. App. 907, 603 N.W.2d 684 (2000).

### *Jurisdiction to Terminate Parental Rights Without Prior Advisement.*

■ Regardless of their failure to directly appeal from the initial adjudication, Nathan and Robyn contend that the juvenile court's failure to properly inform them as to the possible consequences of the State's juvenile petition prevented the juvenile court from obtaining jurisdiction over them in this proceeding to terminate their parental rights. Generally, collateral attacks on previous proceedings are impermissible, unless the attack is grounded upon the court's lack of jurisdiction over the parties or the subject matter. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). See *In re Interest of Billie B.*, 8 Neb. App. 791, 601 N.W.2d 799 (1999).

Undisputedly, during the initial adjudication hearing, the juvenile court failed to adequately advise Nathan and Robyn of the potential consequences of a juvenile proceeding before Nathan and Robyn admitted that their children were in a dangerous situation as the State alleged in the petition. As to the effect of that failure in the subsequent termination proceeding instituted by the State's motion to terminate, we turn to the Supreme Court's analysis in *In re Interest of Joshua M. et al., supra.* That case resulted from a mother's appeal to this court of the termination of her parental rights to her four children for neglect and habitual use of intoxicating liquor or narcotic drugs. We reversed the juvenile court's order of termination as to three

of the children, finding that the court lacked jurisdiction over the children because it failed to adjudicate them before entering its order terminating the mother's parental rights. See *In re Interest of Joshua M. et al.*, 7 Neb. App. 872, 587 N.W.2d 131 (1998). The State successfully petitioned for further review.

■ The Supreme Court upon its further review noted that Neb. Rev. Stat. § 43-291 (Reissue 1998) states, " 'Facts may also be set forth in the *original petition*, a supplemental petition, or motion filed with the court alleging that grounds exist for the termination of parental rights. . . .' " *In re Interest of Joshua M. et al.*, 256 Neb. at 605, 591 N.W.2d at 564. The court also noted that the plain language of § 43-247(6) states that the juvenile court shall have jurisdiction of " '[t]he proceedings for termination of parental rights as provided in the Nebraska Juvenile Code.' " *In re Interest of Joshua M. et al.*, 7 Neb. App. at 608, 591 N.W.2d at 565. The court concluded that these two sections taken together "indicate that the juvenile court properly acquires jurisdiction over an original action to terminate parental rights as provided in the Nebraska Juvenile Code without prior juvenile court action, including adjudication." *Id.* at 608-09, 591 N.W.2d at 565.

A motion to terminate is included in the relevant language of § 43-291. Thus, the juvenile court also acquires jurisdiction to terminate parental rights when a motion to terminate parental rights containing the grounds for termination is filed, without prior juvenile court action, including adjudication. In the instant case, the State filed a motion to terminate Nathan's and Robyn's parental rights after the initial hearing at which there was an adjudication, based on Nathan's and Robyn's admissions, and while those admissions should not have been accepted and are of no force and effect because of the defective rights advisement, that defect in the prior proceeding does not taint the instant proceeding initiated by the State's motion to terminate.

■ In *In re Interest of Joshua M. et al., supra*, the Supreme Court examined Neb. Rev. Stat. § 43-292(1) through (7) (Reissue 1998) to determine upon what grounds a juvenile court may terminate parental rights without a prior adjudication. The court found that § 43-292(1) through (5) "do[es] not require, imply, or contemplate juvenile court involvement, including

adjudication, prior to the filing of the petition for termination of parental rights." *In re Interest of Joshua M. et al.*, 256 Neb. 596, 609, 591 N.W.2d 557, 566 (1999).

Here, the State's motion to terminate parental rights was based upon § 43-292(2) and (4), the same subsections at issue in *In re Interest of Joshua M. et al.* According to the Supreme Court in *In Re Interest of Joshua M. et al.*, an adjudication was not required prior to the juvenile court's termination of the mother's parental rights based upon the grounds present in § 43-292(2) and (4). Therefore, applying that result here, the juvenile court had jurisdiction to terminate Nathan's and Robyn's parental rights to Brook, Tanner, and Molly whether or not a prior adjudication had occurred. Due to the defect in the adjudication proceedings, we treat the first proceeding as the functional equivalent of "no prior adjudication," using the conceptual framework of the Supreme Court's decision in *In re Interest of Joshua M. et al.* But, as said, that by itself does not deprive the juvenile court of jurisdiction to proceed.

■ However, the Supreme Court in *In re Interest of Joshua M. et al.*, 256 Neb. at 613, 591 N.W.2d at 568, did hold that when a juvenile court proceeds "with a hearing on the termination of parental rights without a prior adjudication hearing where such termination is sought under § 43-292(1) through (5) . . . such proceedings [must] be accompanied by due process safeguards, as statutory provisions cannot abrogate constitutional rights."

This holding is directly applicable here. Therefore, we examine the record to ensure that Nathan and Robyn were accorded their due process rights after the State filed its motion to terminate—particularly with respect to the matter of the advisement of their rights and the possible consequences of the motion to terminate. In a journal entry dated August 29, 2000, the court recounted that it "explains to the parents the nature of the allegations of the Motion to Terminate Parental Rights as well as the consequences if the Court were to grant the motion." The journal entry further recounts that Nathan and Robyn were advised about such things as the burden of proof, the right to confront and cross-examine witnesses, the right to subpoena witnesses, et cetera. We do not recite all matters recounted in the journal entry, as it is sufficient to say that the advisement was complete, comprehensive, and

complied with the requirements of § 43-279. This advisement occurred at a first court appearance of Nathan and Robyn on the State's motion to terminate. This was several months before the December 7 and 8, 2000, trial upon the State's motion to terminate parental rights in which Nathan and Robyn were represented by counsel, presented their own witnesses, and cross-examined the State's witnesses.

We find that the advisement of rights recounted in the court's journal entry of August 29, 2000, was adequate to safeguard Nathan's and Robyn's due process rights. Thus, under *In re Interest of Joshua M. et al., supra,* the juvenile court had jurisdiction to terminate Nathan's and Robyn's parental rights on the statutory grounds found in § 43-292(2) and (4), even though there was not a valid prior adjudication due to failure of the juvenile court to make a proper advisement in the earlier proceeding.

*Sufficiency of Evidence to Terminate Parental Rights.*

Finding that the juvenile court did not lack jurisdiction to terminate Nathan's and Robyn's parental rights, we turn to whether the evidence of neglect under § 43-292(2), or habitual use of intoxicating liquor or narcotic drugs under § 43-292(4), was sufficient to terminate their parental rights to Brook, Tanner, and Molly. To terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds exists and that termination is in the children's best interests. *In re Interest of Michael B. et al.,* 258 Neb. 545, 604 N.W.2d 405 (2000).

We have already comprehensively recounted the history of this family in our "Factual Background" portion of this opinion, which we derived from the evidence introduced on the motion to terminate. We do not repeat those facts here, but conclude, as did the juvenile court, that the evidence clearly and convincingly shows that the use of drugs render Nathan and Robyn unfit and that it is in the children's best interests that Nathan's and Robyn's parental rights be terminated. Both Nathan and Robyn argue that their drug use was sporadic and that they had self-reported their relapses, which they argue forgives or at least reduces the seriousness of their continued usage. We reject that notion as Nathan and Robyn have used drugs repeatedly over

many years and have been unable to abstain from them despite extensive help from various counselors and the Department of Health and Human Services. In short, being a parent demands that at some point the parent's good intentions become reality—that never happened here. Having found sufficient evidence to terminate Nathan's and Robyn's parental rights pursuant to § 43-292(4), we need not consider whether under § 43-292(2) Nathan and Robyn substantially and continuously or repeatedly neglected their children as the State must prove only one of the statutory grounds for parental rights to be terminated. See *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000). Nonetheless, it is impossible to review this record without observing that Nathan's and Robyn's insidious drug use substantially interfered with their ability to care for their family, hold jobs, and maintain housing for the family—all of which is evidence of neglect.

With respect to the best interests of the children, we note that the psychotherapist who worked with Brook and Tanner in July 2000 testified to the negative impact Nathan and Robyn's lifestyle had on their children. Admittedly, the psychotherapist did not examine Molly, who was not even 6 months old at the time the psychotherapist examined her siblings. However, Nathan said that Molly was in the room when he and Robyn injected methamphetamine, and that incident resulted in the children's being removed from Nathan and Robyn's care for the second time. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the children require termination of the parental rights. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Lisa W. & Samantha W., supra; In re Interest of Michael B. et al., supra.* The juvenile court did not err in finding that it was in the best interests of Brook, Tanner, and Molly to terminate Nathan's and Robyn's parental rights.

## CONCLUSION

As a prior adjudication was unnecessary for the juvenile court to terminate Nathan's and Robyn's parental rights, the juvenile court's failure to properly advise Nathan and Robyn of the

potential consequences deriving from a juvenile petition before accepting their admission to the juvenile petition's allegation at the initial adjudication hearing did not deprive the court of jurisdiction to later terminate their parental rights on statutory grounds found in § 43-292(2) and (4). This is because their statutory right of advisement and due process rights were safeguarded by the court's advisement of the potential consequences of a juvenile proceeding at the time that the State filed its motion to terminate parental rights. Finally, the juvenile court did not err in finding that the evidence of Nathan's and Robyn's habitual use of intoxicating liquor or narcotic drugs sufficient to terminate their parental rights to Brook, Tanner, and Molly and that it was in those children's best interests to terminate Nathan's and Robyn's parental rights.

AFFIRMED.