IN RE INTEREST OF PRESTON P., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
V. BRANDY P., APPELLANT.
698 N.W.2d 199

Filed May 31, 2005.   No. A-04-424.

Charles D. Brewster, of Anderson, Klein, Swan & Brewster, for appellant.

Timothy E. Hoeft, Phelps County Attorney, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

SIEVERS, Judge.

Brandy P. appeals from the decision of the Phelps County Court, sitting as a juvenile court, terminating her parental rights to her son Preston P. We reject Brandy's claim that we must reverse the termination because of an alleged lack of jurisdiction at the adjudication phase of the case.

## FACTUAL AND PROCEDURAL BACKGROUND

We are faced with a record in excess of 800 pages which we summarize as follows:

Preston was born to Brandy on March 18, 1999. Records of the Nebraska Department of Health and Human Services (DHHS) identify Preston's father, but according to Brandy, Preston's father's whereabouts are unknown to her. Preston's father is not part of this appeal. Brandy also had another child, Ethan P., born March 25, 2002, who is not involved in this case.

On August 1, 2001, DHHS received an "intake" stating that Brandy was taken to a DHHS facility where she was given four diapers. Brandy stated that those were not enough diapers and that she had no food. On August 3, DHHS received information that Brandy had no diapers for Preston. A DHHS worker and a law enforcement officer went to Brandy's home and found that the home was filthy, including bugs and rotting food. Preston was removed from Brandy's home and placed in an emergency foster home.

On August 13, 2001, a petition was filed by a deputy Buffalo County Attorney alleging that Preston was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002), in that the home he was residing in was found to be "in a seriously unsafe and unsanitary state."

Upon Brandy's request on September 7, 2001, the juvenile court appointed an attorney, Stephen Lowe, to represent her. An admission/denial and adjudication hearing was held on September 17. At that hearing, the petition was read aloud and Brandy acknowledged understanding the contents thereof—although it had to be explained twice. The court informed Brandy of the nature of the proceedings and explained her rights to her. The court also explained the possible dispositions which could be entered if Preston were adjudicated as a child described in § 43-247(3)(a). Brandy admitted the allegations made in the petition. The court determined that her admission was made knowingly, voluntarily, and intelligently, and a factual basis was established. The court then adjudicated Preston as a child described in § 43-247(3)(a), and he was placed in the temporary care and custody of DHHS for out-of-home placement—with the expectation that he would soon be placed with Brandy's parents,

if not with Brandy herself. A journal entry reflecting the juvenile court's findings was filed on September 17. No appeal was ever filed from such adjudication.

On September 28, 2001, Preston was placed with Brandy's parents—although Brandy had been living with them. Brandy moved out of her parents' home when Preston was placed with her parents. In November, after Brandy's parents were denied a license for foster care because both of them had been previously cited for assault, Preston was placed with his third foster family.

On October 1, 2001, upon a motion by the State, the Buffalo County Court had entered an order transferring jurisdiction of Preston's case to Phelps County. A disposition hearing was held on November 5. Brandy objected to the requirement of independent living in the DHHS case plan. Lowe, her attorney, stated that Brandy had limited resources and was pregnant. Brandy was living with her boyfriend and his mother, although her boyfriend was not the father of the expected child (who would be named Ethan, as noted above). The court adopted the DHHS case plan as modified (i.e., requiring that she work toward establishing independent living, where the plan had originally required her to establish it immediately, and requiring that she not allow any other persons who pose a risk to the safety and well-being of her children to stay or reside in her home, where the plan had originally extended that prohibition to all other persons). The court found that reasonable efforts had been made to return Preston to the parental home, but that such return was not in his best interests. The court ordered that Preston remain a ward of DHHS and ordered that a "CASA" worker be assigned to assist the guardian ad litem, who had been appointed for Preston prior to September 17. The journal entry and order reflecting such matters was filed on November 6.

Dr. John Meidlinger, a certified clinical psychologist, evaluated Brandy on January 16, 2002, to obtain information regarding her functioning after she was referred by a DHHS protection and safety worker. Dr. Meidlinger found that Brandy had a verbal IQ of 66, a performance IQ of 63, and a full-scale IQ of 62, placing her in the mildly retarded range of intellectual ability. Dr. Meidlinger's diagnosis was that Brandy had (1) depressive disorder, not otherwise specified; (2) intermittent explosive disorder

(occasionally exploding in angry outbursts); and (3) personality disorder with schizoid, avoidant, and borderline tendencies and, as noted above, mild retardation. Dr. Meidlinger reported that Brandy was apt to be volatile and unpredictable with Preston, overwhelmed by his needs, and prone toward responding to him by distancing herself or becoming angry and retaliating with punishment. Dr. Meidlinger also reported that Brandy "is apt to be only a marginal parent in the best of the times" and that she "is going to continue to have problems with impulse control and poor tolerance for stress and is likely to have continuing problems with being overwhelmed with the care of . . . young [Preston]."

A review hearing was held on May 6, 2002. The court adopted an amended case plan, which required that Brandy sign a medical release for any and all treating physicians and required that she cooperate with DHHS by providing medical information regarding any medical treatments or medications she was undergoing or taking. The court further found that placing Preston with Brandy would not be in his best interests and that he should remain with DHHS. The journal entry reflecting the same was filed on May 7.

Brandy filed a motion on September 7, 2002, seeking a court order returning the custody of Preston to her and also seeking termination of the juvenile proceedings. A review hearing was held on October 30. Brandy testified that she had been living with her boyfriend, Mark B., for over a year and planned to marry him. She testified that she visited Preston 3 days per week, had been preparing meals for him, and had generally been paying her bills. Brandy attended "team" meetings, with a DHHS case manager, a family support worker, and sometimes Mark, her family, or Lowe, twice per month and had three to four sessions left to complete for her parenting classes. Brandy was employed as a dishwasher at a hotel, working 20 to 25 hours per week at $5.15 per hour. Brandy said that she had applied for Social Security disability benefits. Brandy's son Ethan was 8 months old at the time of the hearing and was living with his father while in the custody of DHHS—Ethan had been removed from Brandy's care when he was 4 months old after Brandy left him unattended in a motor vehicle for 15 to 20 minutes. Mark testified that he was willing to assume the role of stepparent of Preston. He worked at a grocery

store at the time of the hearing but was soon going to be working at a convenience store instead. Mark was not attending Brandy's visits with Preston.

Kelly Madden, a DHHS case manager, testified that Brandy was scheduled for eight parenting classes and had attended three, but had four no-shows and had canceled once. Madden testified that Brandy had improved on fixing meals and had done a nice job with consistency and structure in June and July 2002, but that there had been some regression. Madden testified that Mark had not followed through with his psychological evaluation. Madden testified that it was not in Preston's best interests to be returned to Brandy.

The juvenile court filed its journal entry on November 5, 2002, and found that DHHS had made reasonable efforts to reunify the family but that it was in Preston's best interests to remain in the care and custody of DHHS for out-of-home placement. The court adopted exhibit 7, the case plan and court report.

A review and permanency hearing was held on February 12, 2003. Carrie Martinez, a family support worker, testified that she had been working with Brandy since December 2001 and was not comfortable, at the time of the hearing, with Preston's being returned to Brandy's care. Martinez testified that Preston had visits with Brandy three times per week and that those visits had been moved from a church to Brandy's home. Martinez testified that Brandy could not care for Preston on a full-time basis, as Brandy had a lot of emotional stress. Martinez testified that when Mark was at home, there were a lot of rules and regulations, and that on one occasion, Brandy told her that Mark did not want Brandy and Preston's visits to take place in his home. Martinez also testified that Mark stated that he did not "intend on doing the goals" of the case plan and did not want to participate in the plan. Toward the end of the hearing, Brandy stated, "I'm sorry, Your Honor. I'm done. . . . I can't take this anymore," and the record reflects that she left the courtroom. The juvenile court filed its journal entry on February 14 and adopted the case plan with the added amendment of the goal of independent living for Brandy. The court again found that DHHS had made reasonable efforts to reunify the family, but that it was in Preston's best interests to remain in the care and custody of DHHS for placement.

On February 20, 2003, Brandy filed an "Application for Further Evaluation," seeking a court order authorizing further psychiatric evaluation to determine her state of competency. A hearing on Brandy's application was held on February 26, and the court's "Journal Entry/Order" was filed on March 5. The court found and ordered that Brandy should undergo a further psychiatric evaluation. The court also directed that Dr. Meidlinger, who was to do the evaluation, address the following questions: (1) the extent of Brandy's parenting abilities, whether she would be able to provide sufficient parenting skills then or in the future, and, if so, the projected amount of time she would need to accomplish said skills; (2) whether Brandy was competent to relinquish her rights to Preston for the purpose of adoption; and (3) whether Brandy would be able to display appropriate contact if an open-ended adoption agreement were entered into between her and the adoptive parents.

On June 18, 2003, the Phelps County Attorney filed a motion to terminate Brandy's parental rights with regard to Preston under Neb. Rev. Stat. § 43-292(5), (6), and (7) (Reissue 2004). The alleged grounds for termination were that Brandy was "unable to discharge parental responsibilities because of mental illness or mental deficiency," that Preston remained in an out-of-home placement as a result of Brandy's "failure to comply with or her inability to achieve the goals set forth in the case plan," and that Preston had been in an out-of-home placement "for fifteen or more months of the most recent twenty two months."

An arraignment hearing on the motion to terminate Brandy's parental rights was held on June 25, 2003, and the court's journal entry was filed on July 3. The court advised Brandy of her rights and the consequence of a finding that the State had met its burden of proof—namely that her parental rights regarding Preston would be terminated. The court advised Brandy of the possible pleas, and Brandy entered a denial. The court appointed a guardian ad litem for Brandy. The court also granted Brandy's motion for an additional psychological evaluation.

A review hearing was held on August 6, 2003, which hearing also addressed the motion of Preston's guardian ad litem to terminate visitation, although such motion is not in our record. Brandy waived her right to be present at the hearing because it

was too difficult emotionally for her. Preston's foster mother testified that Preston had recently been exhibiting behavioral changes in the hours and days after his visits with Brandy and that he was angry after visits. She gave examples of such behaviors: throwing things out of the refrigerator, tearing drawers out of his dressers, and breaking a glass bottle that he did not want Brandy to have. Preston's preschool teacher also testified that Preston was aggressive and disruptive on the days after he had visits with Brandy.

Martinez, the family support worker, testified that Brandy was having 3-hour-long visits with Preston, but that Brandy had attended only one visit in June. Madden, the DHHS case manager, testified that in the preceding 6 months, Brandy had attended only one team meeting and had done "very little" to comply with her case plan.

The juvenile court found that it was in Preston's best interests to temporarily suspend regular visits, and the court ordered the involvement of a child therapist or child psychologist to get input on the visitation. A journal entry reflecting the same was filed on August 21, 2003. The court also adopted the DHHS case plan and court report, with some modifications including provisions for a child psychologist or therapist to get involved in therapy for Preston and to determine whether visitation was in his best interests. The court found that reasonable efforts had been made to reunify the family, but that it was in Preston's best interests to remain in the care and custody of DHHS for placement.

On October 1, 2003, Brandy filed a motion to withdraw her admission to the August 2001 petition to have Preston adjudicated. In her motion, Brandy alleged that she admitted to the allegations of the petition "without knowingly and intelligently understanding the ramifications of her admission to those allegations." She also alleged that subsequently to her admission to those allegations, she had been evaluated by Dr. Meidlinger on two separate occasions, and that he stated: " 'I am not at all convinced that Brandy is currently able to understand the implications of her position and it[s] potential permanence.' " She also alleged that Dr. Meidlinger stated: " 'I would strongly recommend that a Guardian Ad Litem be appoint[ed] to assist her in making appropriate decisions in court.' " We note that such a

guardian had been in place for Brandy for a considerable period of time. Brandy alleged that as part of the June 2003 motion to terminate her parental rights, the Phelps County Attorney had stated that Brandy was unable to discharge parental responsibilities " 'because of mental illness or mental deficiency.' " Brandy also alleged that she was unable to comprehend and understand the meanings of her entry of a plea and that as a result, her admissions to the adjudication petition's allegations were invalid.

On October 2, 2003, the Phelps County Attorney filed an objection to Brandy's motion to withdraw her admission. In his objection, the county attorney alleged that (1) Brandy entered her admission in the Buffalo County Court on September 17, 2001, with the assistance of counsel; (2) the disposition hearing was held on November 5 in the Phelps County Court, and Brandy appeared with the assistance of counsel; (3) the deadline to appeal the order of adjudication and disposition was December 6, and at no time before or after that deadline did Brandy file a notice of appeal; and (4) nearly 2 years had passed since the admission, the evaluations relied upon by Brandy's attorney occurred 1½ years after the initial disposition was held, and there were no allegations contained in those evaluations that alleged that Brandy was incapacitated at any time during the months of September or November 2001. On October 8, 2003, Brandy filed a reply to the county attorney's motion to terminate her parental rights.

At a hearing on October 7, 2003, the juvenile court heard Brandy's motion to withdraw her admission, and it then moved forward with the termination hearing while taking Brandy's motion to withdraw her admission under consideration. Brandy's motion was later overruled. The termination hearing was completed on October 8. At the hearing, Dr. Meidlinger, the clinical psychologist, testified that he conducted an evaluation of Brandy in January 2002 and got the impression that she was intellectually limited. After having Brandy perform the "Wechsler Adult Intelligence Scale–III" test, he found that Brandy had a verbal IQ of 66, a performance IQ of 63, and a full-scale IQ of 62, placing her in the mildly handicapped or retarded range of intellectual ability (that of the lowest 3 percent of the population in terms of functioning on the test). Dr. Meidlinger's diagnosis was that Brandy had (1) depressive disorder, not otherwise specified; (2)

intermittent explosive disorder (occasionally exploding in angry outbursts); and (3) personality disorder with schizoid, avoidant, and borderline tendencies and, as noted above, mild retardation. Dr. Meidlinger testified that he believed that Brandy was apt to be volatile and unpredictable with Preston, easily overwhelmed by his needs, and prone toward responding to him by distancing herself or becoming angry and retaliating with punishment.

Dr. Meidlinger testified about another meeting with Brandy, in May 2003. In that meeting, he and Brandy discussed open adoption with visitation. Brandy initially said that she would relinquish Preston's custody if she had visitation every weekend, but at another point in the meeting, she stated that she wanted reunification with Preston. Dr. Meidlinger testified that Brandy was at "continuing risk for impulsive acting out behavior; inconsistent, unstable relationships and work; continuing risk for social isolation; and continuing difficulties understanding and reacting appropriately to events and relationships" and that such would affect her ability to parent. In his May evaluation, Dr. Meidlinger recommended the appointment of a guardian ad litem for Brandy because of her intellectual limitation—we again note that such appointment had been done some time previously. Dr. Meidlinger testified that he had "serious doubts" about whether Brandy was mentally competent to relinquish her parental rights, but that with the assistance of a guardian ad litem, she would be able to do so—specifically, that Brandy needed explanatory language brought down to a fifth grade level before she would be able to understand it. Dr. Meidlinger testified that Brandy's chances of being able to successfully parent were very small, even over a long period of time. He testified that it would be in Preston's best interests not to be returned to Brandy's home and that Brandy's parental rights should be terminated.

Lowe, the attorney who represented Brandy at the September 2001 adjudication, testified that Brandy understood what was going on and that Brandy made a knowing admission to the adjudication petition's allegations. Lowe testified that Brandy did not undergo a psychological evaluation revealing her mental deficiency until several months after the adjudication. Lowe also testified that he had no reason to question Brandy's competence or her ability to assist with her own defense.

Madden, the case manager, testified that out of 83 available work sessions with a "healthy family" worker, Brandy attended 49, canceled 24, and no-showed 10 times. Madden also testified that out of 327 scheduled visits with Preston, Brandy attended 208½, canceled 114½, and no-showed 5 times. Madden testified that the professional who did Mark's psychological evaluation in January 2003 recommended "conjoint counseling" for Brandy and Mark's relationship and individual counseling for Mark, but that Mark refused counseling. Madden testified that Brandy attended few visits between February and August 2003. Madden testified that over the course of Brandy's contact with DHHS, she had lived at both her parents' house and Mark's house, and that Brandy started out strongly making progress on her case plan but, toward the end, had had a lack of progress. Madden testified that Mark often refused to participate in visitations or parenting sessions and that it was suggested to Brandy that she leave Mark if he was not willing to participate. Madden also testified that Brandy had had several contacts with law enforcement: (1) There was a domestic disturbance in June 2002, (2) Ethan was removed from Brandy's custody in July or August 2002, (3) Mark called to file a protection order against Brandy in January 2003 regarding her aggressive behavior, and (4) Brandy was caught shoplifting in April 2003.

A licensed mental health practitioner testified that she had been counseling Preston since August 29, 2003, and that she had met with him five times. She testified that Preston was "high-maintenance" and very active, defiant, and bossy. She testified that Preston tried to throw furniture and to hit and that she and Preston were working on behavior management. She recommended that if there were visitation after termination, it should be only twice a year and not during the holidays.

Martinez, the family support worker, testified that "anything that Mark was not going to agree [to] would backset [Brandy]." Martinez testified that Brandy was able to deal with increased visitation if she had enough rest and no interruptions or no "family involvements." Martinez also testified that up until February 2003, Brandy was making improvements in her parenting skills.

The juvenile court's journal entry on the termination hearing was filed on December 31, 2003. The juvenile court found that

Preston was placed out of Brandy's custody no later than January 2002; that said out-of-home placement continued until June 2003, the month of the filing of the motion to terminate; and that Preston continued in out-of-home placement at the date of the hearing—satisfying the 15-month requirement of § 43-292(7). The juvenile court also found that grounds for termination existed under § 43-292(5) and (6) in that Brandy did not seem to be able to take advantage of the services that the State had offered by reason of choice or by reason of the mental illness or mental deficiencies testified to by Dr. Meidlinger. The juvenile court found that Brandy had not complied with the case plans and that she was no longer attending visitations with Preston with any regularity. The juvenile court also cited Dr. Meidlinger's psychological report, which included the statement that Brandy "is apt to be only a marginal parent in the best of times," and his testimony, which included the statement that she "is apt, in her relationship with [Preston], to be . . . easily overwhelmed by his . . . needs." The juvenile court terminated Brandy's parental rights as to Preston after finding that grounds for termination existed and that such was in Preston's best interests.

Brandy filed a motion for new trial on January 7, 2004, alleging in part that the juvenile court's decision did not address the issue of whether or not it would be in Preston's best interests to have continued visitation with Brandy even if her parental rights were terminated. A hearing was held on January 14, and the juvenile court's journal entry and order was filed on January 22 denying Brandy's motion for new trial; however, such order did not resolve the visitation request made in her motion.

The hearing for final determination on Brandy's request for a visitation order was held on March 15, 2004, and the juvenile court's journal entry was filed on March 24. The juvenile court found that because an order had been entered terminating her parental rights, Brandy had no standing to request visitation. However, the juvenile court also found that it may be in Preston's best interests, "because of his age and other factors" as well as based on the opinions of the licensed mental health practitioner who testified at the termination hearing contained in a letter to Brandy's caseworker, that some therapeutic visits be made part of the case plan. Thus, the court ordered "contact or visitation in a

therapeutic setting for the benefit of [Preston]" and stated that "[i]f at some point the therapist determines that those therapeutic visits are more detrimental than beneficial to [Preston's] adjustment, then [DHHS] shall eliminate the therapeutic visits from its case plan." Brandy filed her notice of appeal on April 6, stating her intent to appeal to the Nebraska Court of Appeals the County Court's Order dated December 31, 2003, and March 15, 2004, [finding] that grounds exist for the termination of parental rights of Brandy . . . that the best interest[s] of Preston . . . require that such rights be terminated, that her admission to the original adjudication on September 17, 2001, was valid, and that she had no standing to request visitation.

Although no claim is made that the notice of appeal was not timely filed, we find that it was timely, because the juvenile court had not fully resolved Brandy's request for visitation and thus had not fully resolved the motion for new trial until its journal entry of March 24.

## ASSIGNMENTS OF ERROR

Brandy alleges that the juvenile court erred in (1) not properly obtaining jurisdiction at the adjudication in this matter, because she did not have the mental capacity to understand the concept of entering an admission to the pending juvenile petition and her rights to due process of law were violated by the court's taking jurisdiction at that time; (2) failing to assign her a guardian ad litem prior to accepting her admission to the juvenile petition on file, which failure violated her rights to due process of law; and (3) failing to grant her motion to withdraw her admission to the juvenile petition, for the reason that she was not afforded a guardian ad litem to intervene on her behalf at the time and to represent to the court her mental deficiency and lack of understanding of the effect of her admission to the juvenile petition, and thus violating her rights to due process of law.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, the appellate court will consider and give weight to the

fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Michael R.,* 11 Neb. App. 903, 662 N.W.2d 632 (2003).

## ANALYSIS

■ We begin with the fact that while Brandy is appealing the termination of her parental rights with regard to her son Preston, her assignments of error all relate to the admission/denial and adjudication hearing, from which adjudication she did not appeal. Clearly, an adjudication is a final, appealable order, and case law provides that no collateral attack on an adjudication order is permitted except for a lack of jurisdiction or a denial of due process. See *In re Interest of Ty M. & Devon M.,* 265 Neb. 150, 655 N.W.2d 672 (2003). Thus, our review of her assignments of error in this appeal is limited accordingly.

> The concept of due process embodies the notion of fundamental fairness and defies precise definition. As the U.S. Supreme Court has noted:
>
> "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. '[U]nlike some legal rules,' this Court has said, due process 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' . . . Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter v. Department of Social Services,* 452 U.S. 18, 24-25, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

*In re Interest of Joseph L.,* 8 Neb. App. 539, 546, 598 N.W.2d 464, 470 (1999).

*Jurisdiction and Guardian Ad Litem.*

■ Brandy argues that the juvenile court violated her due process rights by not properly obtaining jurisdiction at the adjudication in this matter, on the ground that she did not have the

mental capacity to understand the concept of entering an admission to the pending juvenile petition and because the juvenile court failed to assign her a guardian ad litem prior to accepting her admission to the juvenile petition on file. "Every court has inherent power to appoint a guardian ad litem to represent an incapacitated person in that court." *In re Interest of A.M.K.*, 227 Neb. 888, 889, 420 N.W.2d 718, 719 (1988). After reviewing Nebraska law, we do not find a standard of review for the failure to appoint a guardian ad litem for a parent at an adjudication hearing. But, because such an appointment necessarily would involve a factual determination by the trial court—based on evidence and observations of the person before the court—the appropriate standard of our review would be for an abuse of discretion. By itself, the fact that Brandy required two explanations of the proceedings did not compel appointment of a guardian ad litem, given that counsel did not request such an appointment and the record reveals no obvious incompetency or need for such an appointment. However, to further flesh out the matter, and because of a paucity of case law on this issue, we turn to the criminal law where the standard arguably is higher—given the civil nature of juvenile proceedings.

In *State v. Johnson*, 4 Neb. App. 776, 551 N.W.2d 742 (1996), Darrell Johnson was charged with two counts of incest, and as part of a plea bargain, he pled guilty to one count. During a post-conviction relief hearing, Johnson's attorney testified:

"[W]e kept proceeding, and we would go from one meeting to the next and . . . Johnson . . . would kind of indicate that maybe he didn't understand what I said the first time. So we would repeat it. Eventually, it came down to asking [a psychiatrist] to perform an evaluation which included a determination with regard to competency to stand trial."

*Id.* at 778, 551 N.W.2d at 746. During an earlier plea hearing, Johnson's attorney had put into evidence a copy of the psychiatrist's report which said that Johnson was incompetent to stand trial. The psychiatrist diagnosed Johnson as suffering from posttraumatic stress disorder and dissociative disorder, with associated paranoia, and noted that Johnson had stated that his actions in his past were " 'as if someone else took his place.' " *Id.* However, Johnson's attorney did not request a hearing on

competency, and the court did not hold such a hearing sua sponte. The court asked Johnson how old he was, what school grade he had completed, whether he could read and write, whether he could understand what the judge was saying, and whether he was on drugs. Johnson answered appropriately, and the court, finding that Johnson had freely, voluntarily, knowingly, and intelligently withdrawn his former plea of not guilty, entered a guilty plea.

The following colloquy then occurred on the record between Johnson and his attorney:

"[Attorney]: . . . We discussed also your competency to stand trial?

"[Johnson]: Right.

"[Attorney]: And you believe that you were competent to stand trial and competent to enter this plea today?

"[Johnson]: That is correct."

The court then asked Johnson whether he committed the offense contained in the information. The following colloquy then occurred:

"[Johnson]: I wasn't here — I don't know. I do believe that it happened, yes.

"THE COURT: I'm sorry. I can't hear you.

"[Johnson]: I do believe it happened.

"THE COURT: Okay, and you believe you did it?

"[Johnson]: Well, I think Darrell Johnson did it, yes.

"THE COURT: And you're Darrell Johnson.

"[Johnson]: I'm Darrell Johnson.

"THE COURT: And you did it?

"[Johnson]: Well, I wasn't here, you know, I can't say.

"THE COURT: You don't have any independent recollection of it taking place; is that correct?

"[Johnson]: That is correct.

. . . .

"THE COURT: And even though you don't have an independent recollection of it taking place, you're willing to proceed with a guilty plea at this time based upon the information they have told you?

"[Johnson]: Yes."

The court then found that Johnson had the capacity to understand the nature and the object of the proceedings against him, that he was able to "comprehend his own position in reference to the proceedings against him," and that he was able to make a rational defense and decision on how he should proceed. The court further found, beyond a reasonable doubt, that Johnson understood his rights and freely and voluntarily waived his rights and entered a plea.

*State v. Johnson*, 4 Neb. App. 776, 779-80, 551 N.W.2d 742, 747 (1996). In Johnson's postconviction appeal, after finding that the trial court had been faced with reasonable doubt regarding Johnson's competency at the plea hearing and at sentencing, we held that the trial court's failure to hold a full, fair, and adequate hearing on Johnson's competency to stand trial was a denial of due process and constituted plain error.

We have detailed *Johnson* extensively because, while a criminal case, it involves a collateral attack on the validity of a plea on competency grounds, and thus, is illustrative of what is needed to succeed in such a collateral attack. In the case before us, in contrast to *Johnson*, the record does not show that either the trial judge or Lowe, Brandy's own counsel at the hearing at issue, was aware of Brandy's diminished mental capacity or that such diminished capacity would prevent her from entering a valid plea at the time of the admission/denial and adjudication hearing. Our review of that initial proceeding reveals that the trial judge comprehensively provided the advisement of rights provided for in Neb. Rev. Stat. § 43-279.01 (Reissue 2004). When asked whether she understood the allegations in the deputy county attorney's petition, her rights, and the possible outcomes of various pleas, Brandy originally stated that she did understand and that she did not have any questions. The trial judge asked Lowe whether he believed that Brandy was prepared to enter an admission or denial, and Lowe explained that Brandy had indicated that she did want to have a trial and that the allegations in the petition were not true.

Lowe then asked the court whether he could have a moment with Brandy, and after a brief recess, it was brought to the court's attention that Brandy needed clarification. The following colloquy was had on the record:

[Attorney] LOWE: Your Honor, maybe we can clarify a couple of things for [Brandy] that she told me that she didn't understand. And I'm not sure exactly what it was that you said that she understood and what it was that she didn't understand, so I'm just going to have her ask you to repeat whatever part she didn't get. So you need - - -

[Brandy]: I didn't exactly understand any of it.

THE COURT: You didn't understand what?

[Brandy]: I didn't understand any of it. With the words.

THE COURT: Well, then let's just go back through things.

While going over her rights and the possible outcomes of various pleas for the second time, the trial judge asked Brandy whether she understood the various aspects, and she made such responses as "Kinda," "Okay," "Yeah," and "Yes." Then the trial judge asked Brandy, "So at this point, do you have any questions at all about it?" Brandy replied, "No." The trial judge also asked Brandy whether she felt that she had had a full opportunity to talk to Lowe about what she should do, and Brandy replied in the affirmative. The trial judge then asked Lowe whether he felt that Brandy was ready to either admit or deny the allegations, and he responded that he believed Brandy to be ready. Brandy then admitted the allegation in the deputy county attorney's petition that Preston was a child described under § 43-247(3)(a). (The State provided the following factual basis to the court: On or about August 3, 2001, law enforcement and DHHS personnel went to Brandy's residence, where Preston was also living; the residence "was found to be in a state that was unsafe for [Preston] to be living in, including bugs, rotting food, lack of proper bedding, et cetera"; and, after the investigation, Preston was removed from the residence and from Brandy.) After Brandy admitted the allegations in the petition, the trial judge asked her whether she understood that she would not receive an adjudication trial, and Brandy said that she understood. Asked whether Brandy's admission was in contemplation of the State's not pursuing possible criminal charges arising out of the incident, Lowe responded, "That's part of it, too, Your Honor."

■ At the termination hearing in October 2003, Lowe, who as recounted above had represented Brandy at the admission/denial

and adjudication hearing, testified (by telephone) that he thought Brandy understood what was going on and that there were no questions regarding Brandy's mental capacity at the time of the admission/denial and adjudication hearing. Lowe testified that he had fully discussed the admission with Brandy before she entered it and that she had indicated that she fully understood the consequences and ramifications of that admission. Lowe testified that Brandy's mental capacity was not brought to anyone's attention until she was evaluated by Dr. Meidlinger, several months after the admission/denial and adjudication hearing. Our record shows that Dr. Meidlinger's evaluation occurred in January 2002. Given that the juvenile adjudication process is complicated and obscure to a layperson who has never been involved in it, no inference of incompetency can be drawn from the fact that Brandy requested additional explanations from the court—and the court was patient and comprehensive in its explanations of the proceedings and their ramifications. As there was no evidence or reasonable inference that Brandy did not have the mental capacity to understand the concept and consequences of entering an admission to the pending juvenile petition, we cannot say that the trial court erred in failing to appoint a guardian ad litem for her prior to accepting her admission. Clearly, Brandy's mental capacity was not put in issue as the defendant's had been in *State v. Johnson*, 4 Neb. App. 776, 551 N.W.2d 742 (1996); thus, the juvenile court was not on notice of the need for a competency determination before proceeding, as we found the criminal court to have been in *Johnson*. The most that this record shows is that Brandy asked for additional explanation, and as noted above, that fact by itself does not equate to a finding of incompetency. Accordingly, the trial court had jurisdiction at the time of the admission/denial and adjudication hearing, and no denial of due process was then present— remembering that by the time of the termination proceeding, Brandy did have a guardian ad litem.

Moreover, an adjudication is not required prior to termination of parental rights under § 43-292(1) through (5). See *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999). See, also, *In re Interest of Brook P. et al.*, 10 Neb. App. 577, 634 N.W.2d 290 (2001). And, one of the grounds for termination in the instant case was that of § 43-292(5), that Brandy

was "unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." Therefore, the prior adjudication and admission cannot be prejudicial to Brandy, as we could simply ignore the prior adjudication and assess whether grounds existed under § 43-292(5). See *In re Interest of Brook P. et al., supra* (treating first proceeding as functional equivalent of "no prior adjudication" due to defect in adjudication proceedings and finding that such treatment by itself does not deprive juvenile court of jurisdiction to proceed). Brandy did have a guardian ad litem at the termination hearing; thus, there could not have been a violation of her due process rights such as she claims with respect to the termination proceedings. See Neb. Rev. Stat. § 43-292.01 (Reissue 2004) (when termination of parent-juvenile relationship is sought under § 43-292(5), court shall appoint guardian ad litem for allegedly incompetent parent; court may, in any other case, appoint guardian ad litem, as deemed necessary or desirable, for any party).

*Motion to Withdraw Admission.*

Finally, Brandy argues that the juvenile court violated her due process rights by failing to grant her motion to withdraw her admission because she was not afforded a guardian ad litem at the admission/denial and adjudication hearing. However, our earlier discussion answers this claim and establishes that there was no error in denying her motion to withdraw her admission.

## CONCLUSION

The juvenile court did not err in failing to appoint Brandy a guardian ad litem at the admission/denial and adjudication hearing; nor did the court err in accepting her admission to the petition's allegations, which admission is not subject to collateral attack. Because we have de novo review in this case, we note, despite the lack of assignments of error attacking any aspect of the termination hearing or its findings and outcome, that the record establishes that the juvenile court properly terminated Brandy's rights as to her son Preston.

AFFIRMED.